## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 20-cr-104 (NEB/TNL) |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| Matthew Lee Rupert, | |
| Defendant. | |

Angela M. Munoz and Jordan L. Sing, Assistant United States Attorneys, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Jordan S. Kushner, Law Office of Jordan S. Kushner, 431 South Seventh Street, Suite 2446, Minneapolis, MN 55415 (for Defendant).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Matthew Lee Rupert's Motion to Suppress Evidence Seized Pursuant to Search Warrants, ECF No. 30; Motion to Suppress Evidence from Search and Seizure of Defendant and Vehicle in Chicago, ECF No. 31; Motion to Suppress Statement, ECF No. 32; Motion to Dismiss Indictment for Failure to State Offense, ECF No. 33; and Motion to Dismiss Charges Based on Void for Vagueness and Overbreadth, ECF No. 34. These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Nancy E. Brasel, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

1

A hearing was held on September 30, 2020.  ECF No. 51.  Assistant United States Attorneys Angela M. Munoz and Jordan L. Singer appeared on behalf of the United States of America (the "Government").   Attorney Jordan S. Kushner appeared on behalf of Defendant.   Post-hearing briefing is now complete, and these motions are ripe for a determination by the Court.

## II. FINDINGS

The Court heard testimony from Special Agent F. M. Stephens with the Federal Bureau of Investigation ("FBI").  The Government offered and the Court received: Exhibit A, the application, affidavit, and search warrant for certain Facebook accounts ("Facebook Warrant"); Exhibit B, the receipt for property received/returned/released/seized in connection with the execution of Exhibits C and D ("Receipt"); Exhibit C, the application, affidavit, and search warrant for Defendant's residence in Galesburg, Illinois, in connection with riot and civil disorder ("Riot Warrant"); Exhibit D, the application, affidavit, and search warrant for the same residence in connection with firearms and drugs ("Drug Warrant"); Exhibit E, an incident report dated May 31, 2020, from the Chicago Police Department ("Arrest Report"); Exhibit F, Facebook posts by "El Ricco Rupert"; Exhibit G, video of the May 31, 2020 interview of Defendant; and Exhibit H, an advice-of-rights form dated May 31, 2020, and signed by Defendant.  Following the hearing, attached to its post-hearing memorandum, the Government submitted a copy of a curfew order imposed by the mayor of Chicago on May 30, 2020, between the hours of 9:00 p.m. and 6:00 a.m.

("Curfew Order").[1]  *See generally* Gov't Ex. 1, ECF No. 60-1.  Based upon the file and documents contained therein, along with the testimony and exhibits presented, the undersigned Magistrate Judge makes the following findings.

Special Agent Stephens has been with the FBI for 20 years and is assigned to the Minneapolis, Minnesota office.  Tr. 24:20-23, 25:8-9, 80:22-81:14, ECF No. 54.[2]  Special Agent Stephens currently works as "a weapons of mass destruction coordinator," and his duties include preparing for, training, and investigating "anything that may involve weapons of mass destruction."  Tr. 25:10-16.

### A.  Death of George Floyd & Public Protests

"On May 25, 2020, George Floyd died while in the custody of the Minneapolis Police Department."[3]  Indictment ¶ 1, ECF No. 12; *see* Tr. 28:16-22; *see also* Riot Warrant at 2574.[4]  "The nature and circumstances of Mr. Floyd's arrest, subsequent death, and the actions of the Minneapolis Police Department came under intense public scrutiny." Indictment ¶ 1; *see also* Riot Warrant at 2574.  "Almost immediately following Mr. Floyd's death, public protests began in Minneapolis[,] . . . expanded throughout the Twin Cities,"

---

[1] Defendant requested and was granted the opportunity to file a reply.  ECF Nos. 61, 63; *see also* Def.'s Mem. in Supp. at 5 n.2, ECF No. 59; *see generally* Def.'s Reply, ECF No. 68.

[2] Although the transcript has been temporarily sealed to allow for the process of redacting any personal identifiers, *see generally* D. Minn. LR 5.5, any notice of intent to request redaction was due October 13, 2020, and no such notice was filed.  ECF No. 54.

[3] *See, e.g.*, *Goyette v. City of Minneapolis*, No. 20-cv-1302 (WMW/DTS), 2020 WL 3056705, at *1 (D. Minn. June 9, 2020) ("On May 25, 2020, George Floyd died as a result of an encounter with four officers of the Minneapolis Police Department (MPD). Video of the encounter captured by bystanders shows MPD officers placing Floyd, who is black, in handcuffs and pinning him to the ground face down, while then-officer Derek Chauvin knelt on Floyd's neck. Floyd and several bystanders pleaded with Officer Chauvin to change his position to allow Floyd to breath[e]. Officer Chauvin refused and continued to kneel on Floyd's neck for several minutes after Floyd became unresponsive."); *see also Vernio v. Higgins*, No. 19-cv-3024 (DWF/LIB), 2020 WL 3542757, at *4 (D. Minn. June 29, 2020) ("On May 25, 2020, George Floyd, a 46-year-old African American man was killed by a police officer in Minneapolis, Minnesota when the police officer knelt on Floyd's neck for seven minutes and forty-six seconds.").

[4] For ease of reference, the Court cites to the bates-stamped page numbers of the Government's exhibits where available.

and spread "throughout the United States and elsewhere." [5]   Indictment ¶ 1; *see* Tr. 28:19-23; *see also* Riot Warrant at 2574.   Some of this activity went beyond public protest and non-violent civil disobedience and, instead, "devolved into rioting, looting, and arson," among other things.   Tr. 28:22-25.   Special Agent Stephens was asked to assist in the investigation of these events.   Tr. 25:17-21.

### B.  El Ricco Rupert Facebook Video

Defendant lives in Galesburg, Illinois.   Tr. 27:21-23.   Around the time of Defendant's arrest, *see infra* Section II.C, law enforcement became aware of a "live," real-time video dated May 29, 2020, posted to the Facebook account of "El Ricco Rupert," Defendant's Facebook account.   Tr. 28:16-19, 29:1-19, 33:17-34:2; *see* Tr. 43:16-44:1, 63:13-19; *see also* Facebook Warrant at 2574-76.   The video was just over two hours long. Tr. 29:1-23; *see also* Facebook Warrant at 2574.   In the video, Defendant is "narrating his and his associates' activities . . . in Minneapolis," Minnesota, on May 29.   Tr. 29:1-5; *see* Tr. 31:23-32:4; Facebook Warrant at 2576.

Among other things, the video shows Defendant encouraging others to throw "bombs" at law enforcement; trying to break into a business; trying to light another

---

[5] *See, e.g.*, *Vernio*, 2020 WL 3542757, at *4 ("The death of Mr. Floyd has sparked protests of police brutality both domestically and internationally."); *Goyette*, 2020 WL 3056705, at *1 ("Video of the encounter circulated rapidly, and hundreds of justifiably angry citizens began protesting in Minneapolis and Saint Paul, as well as nationally and around the world."); *see also, e.g.*, *Wise v. City of Portland*, No. 3:20-CV-01193-IM, ___ F. Supp. 3d ____, 2020 WL 5231486, at *1 (D. Or. Sept. 2, 2020) ("George Floyd's tragic killing on May 25, 2020 sparked national and international protests in support of Black lives and against systemic racism in American policing."); *Gonzales v. City of San Jose*, No. 19-CV-08195-NC, 2020 WL 4430799, at *5 (N.D. Cal. July 31, 2020) ("The Minneapolis Police Department's killing of George Floyd on May 25 of this year catalyzed protests throughout the nation against police use of excessive force that continue today."); *Soos v. Cuomo*, 470 F. Supp. 3d 268, 274 (N.D. N.Y. 2020) ("Mass race-related protests have erupted across the nation, including in the State of New York, in response to the death of African-American George Floyd on May 25, 2020.").

business on fire; and taking items from a third business.  Tr. 29:19-30:4; *see* Riot Warrant at 1254-55; Facebook Warrant at 2574-76.   Based on Special Agent Stephens's investigation, Defendant was in Minneapolis for less than 24 hours before returning home to Illinois.  Tr. 32:9-20.

### C. Defendant's Arrest

On May 31, 2020, Defendant was arrested in Chicago around 2:00 a.m.  Tr. 54:8-13; Riot Warrant at 1257; Facebook Warrant at 2577; *see generally* Arrest Report.  At the hearing, Special Agent Stephens testified that he did not communicate with the Chicago police officers who arrested Defendant and did not observe Defendant's arrest.  Tr. 77:7-79:5.  Instead, Special Agent Stephens obtained the Arrest Report in the course of his investigation in cooperation with his FBI counterparts in Illinois, who in turn worked directly with the Chicago Police Department.  Tr. 56:4-59:13; *see* Tr. 61:20-25.

The Arrest Report describes the circumstances of Defendant's arrest.  A curfew had been imposed by the mayor of Chicago on May 30, 2020, between the hours of 9:00 p.m. and 6:00 a.m. "in an effort to minimize the violent rioting (looting, mob actions, property damage)."  Arrest Report at 164; *see* Tr. 83:17-19; *see also* Curfew Order at 1.  The Curfew Order authorized the Chicago Police Department to "ensure compliance with this Order using any means necessary (warning, fine and/or arrest)," and that "any person who violate[d] th[e] Order . . . [would] be subject to arrest."  Curfew Order at 2.

Chicago police received a report of three individuals in possession of an incendiary device in the vicinity of a certain area.  Arrest Report at 164.  Chicago police subsequently observed a group of individuals matching the suspect individuals' description in the area

of the report, standing next to a maroon sedan with the doors open, and approached to investigate as well as enforce the Curfew Order.  Arrest Report at 164; *see* Tr. 55:1-4. Defendant was arrested in the early morning of May 31 for violating curfew.  Tr. 62:2-15; Riot Warrant at 1257; Facebook Warrant at 2577; *see* Tr. 79:6-8, 81:22-24, 97:23-98:6. Defendant was arrested standing next to the vehicle.  Arrest Report at 164; Tr. 60:25-61:25. Defendant admitted to Chicago police that he owned the vehicle and an inquiry of the vehicle showed him as the registered owner.  Arrest Report at 164; Tr. 61:1-18; *see* Tr. 84:14-85:1.  The vehicle was "impounded under MCC violations."  Arrest Report at 164. During a custodial search, a bookbag containing "incendiary explosives/fireworks" was found in the vehicle.  Arrest Report at 164; *see* Tr. 55:5-7, 62:2-4.

### D. Interview of Defendant

Later that morning, Defendant was interviewed by two special agents of the FBI in Chicago.  *See generally* Ex. G; *see also* Tr. 66:9-69:2, 70:10-22, 73:5-7.  The audio from this interview is, at times, difficult to make out.  Just as the agents entered the room in which he is being held, Defendant told them that he wanted to speak with a lawyer.  Ex. G at 1:55-57; *see* Tr. 73:8-12.  Still on their way in, one of the agents responded, "I'm sorry?" Ex. G at 1:59.  Defendant repeated that he did not want to speak with them.  Ex. G at 2:00-01.

The agent said, "Okay," and proceeded to identify himself and the other agent as agents of the FBI.  Ex. G at 2:01-02.  The agent went on to state that they wanted to talk with him, but he understood that Defendant was claiming that he wanted to talk with a lawyer.  Ex. G at 2:03-06; *see* Tr. 86:9-17.  At the hearing, Special Agent Stephens testified

6

that, in his training and experience, it was common practice to confirm that an individual actually wanted to speak with a lawyer. Tr. 73:20-24. Defendant then waved the agents in, telling them it was fine and that he would talk with them. Ex. G at 2:07-11.

The first agent told Defendant that, before they would talk with him, they would read him his rights and make sure that he understood them. Ex. G at 2:14-22. Defendant responded that he knew his rights. Ex. G at 2:22-23. Nevertheless, the second agent went through Defendant's rights off of a form. Ex. G at 2:30-3:13; *see* Tr. 74:6-17; *see generally* Ex. H. Defendant was then asked if he understood his rights and whether he had any questions. Ex. G at 3:14-19. Although Defendant's response is inaudible, the second agent said, "Okay," and asked Defendant to sign the form. Ex. G at 3:20-23.

Before Defendant signed the form, the first agent stepped out to take a phone call. Ex. G at 3:22-34. While Defendant and the second agent waited for the first agent to return, Defendant said something indiscernible to the second agent and reached out to sign the form. Ex. G at 4:55-5:00; *see* Ex. G at 3:34-6:22. The second agent handed the form to Defendant, showed him where to sign, and again explained that these were the rights Defendant was "consenting to." Ex. G at 5:03-10; *see* Ex. H; *see also* Tr. 75:3-5. Defendant can be seen bending over the form while the second agent hands him a pen to sign. Ex. G at 4:56-5:06. Defendant subsequently hands the pen back and the second agent takes the form from him. Ex. G at 5:07-5:11. After Defendant signed the form, the second agent explained that they would wait for the first agent to return before beginning the interview. Ex. G at 5:26-30; *see* Ex. H; *see also* Tr. 75:15-20.

7

Upon his return, the first agent apologized for having to step out; emphasized that he wanted to make sure that Defendant was okay talking with them and that he read and understood his rights; and confirmed that it was Defendant's signature on the form. Ex. G at 6:23-44; *see* Ex. H. Defendant then spoke with the agents about, among other things, the circumstances bringing him to Chicago, with whom he was traveling, and the events of his arrest. Ex. G at 6:50-8:56; *see* Tr. 76:2-16. Afterwards, Defendant stated that he wanted to speak with a lawyer and ended the interview. Ex. G at 8:57-9:10. After the agents left, Defendant can be heard shouting to another individual, instructing that person to say the person wants to speak with a lawyer and not to talk with law enforcement. Ex. G at 10:28-48.

### E. Investigations in Illinois & Minnesota

#### 1. Illinois: Riot & Drug Warrants

Following Defendant's arrest in Chicago, on June 1, 2020, a different FBI special agent applied for a warrant to search Defendant's residence in Galesburg for evidence related to riot and civil disorder in both Minnesota and Illinois. Tr. 40:14-42:17, 93:9-95:4; *see generally* Riot Warrant. The Riot Warrant was based on, among other things, "destructive devices" having been found "in [Defendant's] possession and within his control" at the time of his arrest as well as Defendant's Facebook activity. Riot Warrant at 1254. This activity included but was not limited to: the El Ricco Rupert video in Minnesota described above; another video also from May 29, 2020, in which Defendant is pushing a cart containing multiple items that appear to be stolen from a closed store in Minnesota and stating that he is heading to his vehicle; posts from the night of May 30,

8

2020, indicating that Defendant intends to continue rioting and looting and ultimately heads to Chicago; and videos showing Defendant in Chicago, wanting to start a riot and damage property as well as entering a convenience store that had been broken into and having stolen items placed into his backpack. Riot Warrant at 1254-57.

While executing the Riot Warrant at Defendant's residence, law enforcement observed, "in plain sight, marijuana in glass jars on a dining room table, a large stack of United States Currency secured with a rubber band beside glass jars containing a green vegetation (suspected to be marijuana) on the dining room table," a handgun "lying on the couch in the living room," "a rifle against the wall" in an upstairs bedroom, "a large marijuana grow downstairs in the basement containing numerous marijuana plants, and a large vacuum sealed bag containing suspected marijuana in the stairwell," among other things. Drug Warrant at 1266. Law enforcement stopped their search and applied for and received the Drug Warrant in connection with firearm and drug offenses. Tr. 48:3-13; *see generally* Drug Warrant.

The Riot and Drug Warrants were both obtained by telephone. Riot Warrant at 1251; Drug Warrant at 1265. Each of the applications states that it was based on the attached affidavit. Riot Warrant at 1251; Drug Warrant at 1265. And, at the end of each affidavit, the magistrate judge signed underneath a statement indicating that the affidavit had been "subscribed and sworn to before [him]." Riot Warrant at 1260; Drug Warrant at 1270. The applications similarly stated that each had been "[a]ttested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ Telephone _____

(*specify reliable electronic means*)," and were signed by the magistrate judge.  Riot Warrant at 1251; Drug Warrant at 1265.

A single receipt was left for the execution of both warrants, listing both the Minnesota and Illinois investigative file numbers.  Tr. 51:2-52:6; *see generally* Receipt. Among the items seized in connection with the Riot and Drug Warrants were: two firearms, ammunition and firearms accessories, fireworks, plants, posters, printer cartridges, computer bags, suspected drugs and drug paraphernalia, cash, a rental agreement, glass jars, a travel bag, grow lights, and a digital video recorder.  Receipt at 1.

At the hearing, Special Agent Stephens was asked to identify which items were seized in connection with the Minnesota investigation and which were seized in connection with the Illinois investigation.  Tr. 52:18-54:5.  Special Agent Stephens indicated that the printer cartridges, computer bags, fireworks, and possibly the travel bag were seized in connection with the Minnesota investigation into rioting and civil disorder.  Tr. 52:18-53:11, 95:5-24.  Special Agent Stephens did not know whether the posters were seized in connection with the Minnesota investigation or what they said.  Tr. 53:12-15, 95:25-96:17. Special Agent Stephens additionally testified that the firearms and related accessories as well as the suspected drugs and drug paraphernalia were not part of the Minnesota investigation.  Tr. 53:16-54:5.

### 2.  Minnesota: Facebook Warrant

Special Agent Stephens requested the Facebook Warrant from a magistrate judge in the District of Minnesota.  Tr. 34:3-4, 91:1-8; *see, e.g.*, Facebook Warrant at 2571-72.  Due

to the COVID-19 pandemic, an electronic process was used. Facebook Warrant at 2571; Tr. 34:13-35:4.

Special Agent Stephens presented himself and the written warrant materials to the magistrate judge using both a secure, simultaneous audio and visual connection through FaceTime and e-mail. Tr. 34:13-35:1, 36:13-21, 38:24-39:12, 91:18-21; *see also* Facebook Warrant at 2571. A copy of the written warrant materials was provided to the magistrate judge before the meeting. Tr. 36:22-37:1, 91:22-92:6. Just as if he had been present in person, Special Agent Stephens was sworn in and attested to the accuracy of the warrant materials before the magistrate judge. Tr. 35:11-13; 37:13-15, 92:16-93:2.

The basis for the Facebook Warrant was presented to the magistrate judge solely through Special Agent Stephens's affidavit. Tr. 35:20-36:9. After having been sworn in by the magistrate judge, Special Agent Stephens then showed the unsigned documents to the magistrate judge. Tr. 36:22-37:4. Thereafter, making a point to ensure that "there was no interrupted video" feed and that the magistrate judge "could physically see [him] moving [his] hand to the document and signing it," Special Agent Stephens signed the documents. Tr. 37:5-9, 93:3-4. After the documents were signed, Special Agent Stephens was directed by the magistrate judge to scan and e-mail the signed documents. Tr. 37:9-11, 16-37:2. The magistrate judge subsequently signed the documents and Special Agent Stephens was provided with a fully signed warrant to execute. Tr. 38:3-16.

At the end of the affidavit in support of the Facebook Warrant, the magistrate judge signed underneath a statement indicating that the affidavit had been "SUBSCRIBED and SWORN to before [her] by reliable Electronic means (FaceTime and email) pursuant to

Fed. R. Crim. P. 41(d)(3)."  Facebook Warrant at 2584; *see also* Facebook Warrant at 2571

("SUBSCRIBED and SWORN before me by reliable electronic means (FaceTime and

email) pursuant to Fed. R. Crim. P. 41(d)(3).") (application); Tr. 38:22-39:9.

### III. CONCLUSIONS OF LAW

Based upon the foregoing findings, the undersigned Magistrate Judge makes the

following conclusions of law.

### A.  Motion to Suppress Evidence: Facebook, Riot & Drug Warrants

The Court begins with Defendant's challenge to the three warrants.

#### 1.  Facebook Warrant

As noted above, the Facebook Warrant was obtained using an electronic process,

whereby the affidavit and written warrant materials were presented to the issuing

magistrate judge using both a secure, simultaneous audio and visual connection through

FaceTime and e-mail.  The Federal Rules of Criminal Procedure expressly contemplate

that "a magistrate judge may issue a warrant based on information communicated by

telephone or other reliable electronic means."  Fed. R. Crim. P. 41(d)(3); *see* Fed. R. Crim.

P. 4.1(a) ("A magistrate judge may consider information communicated by telephone or

other reliable electronic means when reviewing a complaint or deciding whether to issue a

warrant or summons.").

When telephone or other reliable electronic means are used, Rule 4.1 requires the

magistrate judge to place "the applicant and any person on whose testimony the application

is based" under oath.  Fed. R. Crim. P. 4.1(b)(1); *see, e.g.*, *United States v. Skarda*, 845

F.3d 370, 375 (8th Cir. 2016).  The manner in which a record is then created depends on

12

whether the applicant merely "attest[s] to the contents of a written affidavit" or if additional testimony or exhibits are considered by the magistrate judge.  Fed. R. Crim. P. 4.1(b)(2); *see Skarda*, 845 F.3d at 375.  "If the applicant does no more than attest to the contents of a written affidavit submitted by reliable electronic means, the [magistrate] judge must acknowledge the attestation in writing on the affidavit."  Fed. R. Crim. P. 4.1(b)(2)(A); *see Skarda*, 845 F.3d at 375.  If additional testimony or exhibits are considered,

> the [magistrate] judge must:
>
> > (i) have the testimony recorded verbatim by an electronic recording device, by a court reporter, or in writing;
> >
> > (ii) have any recording or reporter's notes transcribed, have the transcription certified as accurate, and file it;
> >
> > (iii) sign any other written record, certify its accuracy, and file it; and
> >
> > (iv) make sure that the exhibits are filed.

Fed. R. Crim. P. 4.1(b)(2)(B); *see Skarda*, 845 F.3d at 375.

Defendant argues the magistrate judge did not create a proper record under Rule 4.1(b) for the Facebook Warrant.  The basis for the Facebook Warrant was presented to the magistrate judge solely through Special Agent Stephens's affidavit.  There was no additional testimony.  *Contra* Fed. R. Crim. P. 4.1(b)(2)(B).  Nor were there any additional exhibits.  *Contra* Fed. R. Crim. P. 4.1(b)(2)(B).  Consistent with Rule 4.1(b)(2)(A), the magistrate judge expressly acknowledged, in writing, that Special Agent Stephens attested to the contents of his affidavit by reliable electronic means.  Given that Special Agent Stephens did no more than attest to the contents of his affidavit and the written materials

previously provided to the magistrate judge, the magistrate judge properly acknowledged Special Agent Stephens's attestation in writing on his affidavit and there was no failure to create the record required under Rule 4.1(b).

Accordingly, the Court recommends that Defendant's motion be denied in so far as it seeks to suppress evidence obtained from the Facebook Warrant.

### 2.   Riot & Drug Warrants

The Riot and Drug Warrants were both issued by a magistrate judge in the Central District of Illinois.  Rule 41 permits a defendant to move for suppression of evidence "in the court where the trial will occur."  Fed. R. Crim. P. 41(h).

### a.   Proper Record

Like the Facebook Warrant, Defendant argues that the magistrate judge did not create a proper record under Rule 4.1(b) for the Riot and Drug Warrants.  Defendant bases his argument on "information and belief," ECF No. 30 at 1, and the absence of Special Agent Stephens's personal knowledge as to the process utilized in the Central District of Illinois.

Consistent with Rules 4.1(a) and 41(d)(3), the Riot and Drug Warrants were applied for by telephone.[6]  Consistent with Rule 4.1(b)(1), the Riot and Drug Warrants each indicate that the applicant was placed under oath.  Riot Warrant at 1251, 1260; Drug Warrant at 1265, 1270.  The Riot and Drug Warrants also each indicate that they were based on the attached affidavit.  Riot Warrant at 1251; Drug Warrant at 1265.  *See* Fed. R.

---

[6] To the extent Defendant is suggesting that the Government was required "to establish that the telephonic means of communication for obtaining the warrant, as indicated in the warrant, were 'reliable' within the meaning of Rule 41(d)(3)," Def.'s Mem. in Supp. at 12-13, Defendant has offered no authority in support of this argument.

Crim. P. 4.1(b)(2)(A).  Defendant argues that Special Agent Stephens did "not know if there was any discussion between the [magistrate] judge and [the] agent in addition to the presentation of the application."  Def.'s Mem. in Supp. at 12.  There is, however, no evidence in the record suggesting or any basis upon which it could reasonably be inferred that additional testimony or exhibits were considered in connection with either the Riot Warrant or the Drug Warrant.  *See, e.g.*, *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) ("As a general rule, the burden of proof is on the defendant who seeks to suppress evidence . . . ."); *United States v. Golden*, 418 F. Supp. 3d 416, 421 (D. Minn. 2019).  Absent any indication that the Riot and Drug Warrants were based on additional testimony or exhibits and in light of the magistrate judge's written acknowledgement of the applying agent's attestation on the applications and affidavits, there was no failure to create the record required under Rule 4.1(b).  *See* Fed. R. Crim. P. 4.1(b)(2)(A).

### b.    Beyond the Scope

While Defendant listed a number of items initially in his motion to suppress as being beyond the scope of the Riot and Drug Warrants, *see* ECF No. 30 at 2, Defendant's post-hearing arguments focus only on the posters that were seized.  *See* Def's Mem. in Supp. at 12-13.  Defendant argues that Special Agent Stephens did not know how the posters were "related to the alleged offenses" or "how they were covered by the warrant."  Def.'s Mem. in Supp. at 12-13.  Defendant argues that the posters "must therefore be suppressed as beyond the scope of the warrant."  Def.'s Mem. in Supp. at 13.

There is very little information in the record regarding the seized posters.  What the posters say and/or depict is not apparent from the record before the Court.  Defendant has

described them as "containing political statements that are protected speech under the First Amendment."  ECF No. 30 at 2.  Special Agent Stephens did not know what the posters said or if they were related to the Minneapolis investigation.  The Government argues that the Riot Warrant "plainly authorized the seizure of posters containing derogatory statements about law enforcement officers."  Gov't Suppl. Opp'n at 6, ECF No. 60; *see also* Gov't Consol. Resp. at 9, ECF No. 39.  There is, however, nothing in the record indicating that the posters contained derogatory statements about law enforcement officers.  Nor is there anything in the record connecting the posters to the Drug Warrant and the Illinois investigation into firearm and drug offenses.  The absence of information on this subject is confounding, unduly complicating what should have been a straightforward issue.

"The Fourth Amendment requires that a warrant particularly describe the things to be seized."  *Thiel v. Korte*, 954 F.3d 1125, 1129 (8th Cir. 2020) (citing *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)); *see* U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").  "The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant."  *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (citation omitted); *accord United States v. Gregoire*, 638 F.3d 962, 967 (8th Cir. 2011); *see, e.g.*, *United States v. Crawford*, 220 F. Supp. 3d 931, 936 (W.D. Ark. 2016).

"Possession of a search warrant does not 'give the executing officers carte blanche as to its execution.'"  *Stepnes v. Ritschel*, 663 F.3d 952, 962 (8th Cir. 2011) (quoting

*Walden v. Carmack*, 156 F.3d 861, 873 (8th Cir. 1998)).   "When executing a search warrant, a law enforcement official 'must have probable cause to believe that items seized in connection with a valid search warrant are associated with suspected criminal activity.'" *Id.* (quoting *Walden*, 156 F.3d at 873); *see Thiel*, 954 F.3d at 1128.   "Adjudication of whether items seized fit within the warrant's description ultimately turns on the substance of the items seized and not the label assigned to it by [the person from whom the items were seized]." *McClendon v. Story Cty. Sheriff's Office*, 403 F.3d 510, 516 (8th Cir. 2005) (quotation omitted).

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, but on the government to justify a warrantless search."   *Carter*, 729 F.2d at 940 (citation omitted); *see, e.g.*, *Golden*, 418 F. Supp. 3d at 418, 421; *see also, e.g.*, *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005) ("In the case of a warrantless search, the government bears the burden of establishing an exception to the warrant requirement.").   The posters at issue were not obtained pursuant to a warrantless search and, generally speaking, posters related to the criminal activity being investigated fall within the categories of items the Riot and Drug Warrants authorized to be seized. Defendant has not identified any authority that "posters containing political statements that are protected speech under the First Amendment" may not be seized pursuant to a lawful warrant.   ECF No. 30 at 2.   Nor has he articulated what or how that "protected speech" exceeded the scope of the Riot and Drug Warrants.   Absent some articulation of how the seizure of the posters exceeded the scope of the warrants, the Court concludes that Defendant has not met his initial burden as to why this evidence should be suppressed.   *See*

17

*Carter*, 729 F.2d at 940; *Golden*, 418 F. Supp. 3d at 421; *see also Crawford*, 226 F. Supp. 3d at 936-37 (noting "burden of proof for an allegation that the Government exceeded the scope of a search warrant does not appear to be clearly developed in the Eighth Circuit" and concluding defendant "has the initial burden to show that the search exceeded the scope of the warrant").

Based on the foregoing, the Court recommends that Defendant's motion to suppress evidence obtained in connection with the Riot and Drug Warrants be denied.

### B.  Motion to Suppress Evidence: Arrest & Vehicle Search

The Fourth Amendment prohibits unreasonable searches and seizures.  U.S. Const. amend. IV; *United States v. Rowe*, 878 F.3d 623, 628 (8th Cir. 2017).  Defendant argues that law enforcement lacked probable cause to arrest him for violating curfew in Chicago and the warrantless search of his vehicle was unlawful.

### 1.  Curfew Order, Arrest Report & Special Agent Stephens's Testimony

The Court first addresses Defendant's argument that the Government failed to meet its burden with respect to the circumstances of his arrest and the search of his vehicle because the Government "failed to call any witness who participated in, observed or otherwise had any personal knowledge of the arrest of [Defendant] or search of his vehicle."  Def.'s Mem. in Supp. at 4.  Defendant argues that "[t]he Court is left to rely on vague commentary by an FBI agent who was not involved, based on the vague police report that the Court admitted into evidence over the defense objection based on [a] lack of foundation."  Def.'s Mem. in Supp. at 4.

"[T]he interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself.  At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."  *United States v. Raddatz*, 447 U.S. 667, 679 (1980); *accord United States v. Boyce*, 797 F.2d 691, 693 (8th Cir. 1986); *see also United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008); *Golden*, 418 F. Supp. 3d at 421.

> This difference in procedural protections is reflected in the Federal Rules of Evidence.  Rule 104(a) states that the trial court, in making its determination of preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence, "is not bound by the rules of evidence except those with respect to privileges."

*Boyce*, 797 F.2d at 693; *see Golden*, 418 F. Supp. 3d at 421.  But, "although the rules of evidence do not apply in suppression proceedings, this does not mean that there are no standards whatsoever."  *Golden*, 418 F. Supp. 3d at 422.  "The evidence on which the Court relies in ruling on a suppression motion must still be sufficiently reliable and probative."  *Id.*

At the hearing, Special Agent Stephens testified that he obtained the Arrest Report during the course of his investigation through his FBI counterparts in Illinois and their relationship with the Chicago Police Department.  For purposes of the instant motions only, the Court finds Special Agent Stephens's testimony credible and the Arrest Report sufficiently reliable and probative of the circumstances surrounding Defendant's arrest and the search of his vehicle.

### 2. Arrest

"A warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime." *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)); *see also Draper v. United States*, 358 U.S. 307, 310 (1959) ("The crucial question for us then is whether knowledge of the related facts and circumstances gave [law enforcement] probable cause within the meaning of the Fourth Amendment . . . to believe that petitioner had committed or was committing a violation of the narcotics laws." (quotation and footnote omitted)).

"Probable cause is a practical and common-sensical standard that is based on the totality of the circumstances and requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017) (quotation omitted). "To determine whether an officer had probable cause for an arrest, [courts] examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quotation omitted). In the end, "[p]robable cause 'is not a high bar.'" *Wesby*, 138 S. Ct. at 586 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 243-244, n.13 (1983)).

20

Here, the mayor of Chicago imposed a citywide curfew on May 30 from 9:00 p.m. to 6:00 a.m. in response to large protests, which had resulted in acts of violence and destruction. The Curfew Order provided that violation of the curfew was an arrestable offense. Defendant was subsequently observed by Chicago police out in the early morning hours of May 31, during the hours of curfew.

Defendant argues that being out during the hours of curfew cannot form the basis for his arrest because the Arrest Report did not identify a specific law he is alleged to have violated. Defendant further argues the Curfew Order itself was flawed, exceeding the bounds of the mayor's authority and the ordinances cited therein as well as infringing upon his rights of free speech and freedom of movement.

The Court expresses no opinion on the ultimate validity of the Curfew Order and whether Defendant may have available to him certain legal defenses in the event he is charged with violating that Order. Probable cause does not require arresting officers "to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest." *Winarske*, 715 F.3d at 1067.

Probable cause is assessed "from the viewpoint of a reasonably prudent police officer acting in the circumstances of the particular case." *United States v. Davis*, 867 F.3d 1021, 1027 (8th Cir. 2017) (quotation omitted); *see also, e.g.*, *United States v. Magness*, 69 F.3d 872, 874 (8th Cir. 1995) ("Probable cause exists if the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a prudent person's belief that the suspect had committed or was committing an offense."). Under the totality

of the circumstances, especially the civil unrest in which the Curfew Order was issued, a reasonably prudent Chicago police officer having knowledge of the Curfew Order would believe that someone out during curfew has committed or is committing a crime. Accordingly, there was probable cause for Chicago police to believe that Defendant had committed a crime by violating the Curfew Order and arrest him without a warrant.

### 3.   Vehicle Search

Defendant also challenges the warrantless search of his vehicle following his arrest. "The Fourth Amendment generally prohibits warrantless searches, subject to a few narrow exceptions." *United States v. Dunn*, 928 F.3d 688, 692 (8th Cir. 2019). "One such exception allows law enforcement to inventory the contents of a lawfully impounded vehicle without a warrant or probable cause." *Id.* (quotation omitted). "Another exception allows officers to search a vehicle if, before searching, they have probable cause to believe the vehicle contains contraband or other evidence of a crime." *Id.* (quotation omitted).

### a.   Inventory Search

"Inventory searches are one of the well-defined exceptions to the warrant requirement of the Fourth Amendment." *United States v. Morris*, 915 F.3d 552, 556 (8th Cir. 2019) (quotation omitted). "It is 'well-settled' law that 'a police officer, after lawfully taking custody of an automobile, may conduct a warrantless inventory search of the property to secure and protect vehicles and their contents within police custody.'" *United States v. Williams*, 777 F.3d 1013, 1015 (8th Cir. 2015) (quoting *United States v. Rehkop*, 96 F.3d 301, 305 (8th Cir. 1996)); *see also Morris*, 915 F.3d at 556. "Police may take

protective custody of a vehicle when they have arrested its occupants, even if it is lawfully parked and poses no public safety hazard." *Morris*, 915 F.3d at 556 (quotation omitted).

Defendant was observed standing next to a maroon sedan, with the doors open, at the time of his arrest. Arrest Report at 164. Defendant was arrested along with the other individuals accompanying him. Arrest Report at 164. At the time of his arrest, Defendant admitted to Chicago police that he owned the vehicle and an inquiry of the vehicle showed him to be the registered owner. Arrest Report at 164. Chicago police took the vehicle into custody and impounded it for "MCC violations." Arrest Report at 164. An inventory search of the vehicle "revealed a red bookbag with incendiary explosives/fireworks." Arrest Report at 164. Pursuant to the inventory-search exception, the warrantless search of Defendant's vehicle was lawful.

#### b.   Probable Cause

Regardless of any need to inventory the contents of Defendant's vehicle in connection with the impoundment, there was probable cause to believe the vehicle contained contraband or other evidence of a crime. "Under the 'automobile exception' to the Fourth Amendment, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Winarske*, 715 F.3d at 1068; *see also Dunn*, 928 F.3d at 693. This includes the trunk and containers in the vehicle. *See, e.g.*, *Arizona v. Gant*, 556 U.S. 332, 347 (2009) ("If there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820-21 (1982), authorizes a search of any area of the vehicle in which the evidence might be found.") (citations omitted); *United States v.*

*Walker*, 840 F.3d 477, 483 (8th Cir. 2016) (trunk); *United States v. Brooks*, 715 F.3d 1069, 1075 (8th Cir. 2013) (containers).  "Probable cause for a search under the automobile exception exists if the facts and circumstances known to the officers when they began the search were sufficient in themselves for a person of reasonable caution to believe that contraband or evidence of criminal activity was present in the vehicle."  *Walker*, 840 F.3d at 483.

Prior to searching the vehicle, law enforcement had received a report describing three individuals "in possession of [an] inc[e]ndiary device in the area of Ida B[.] Wells and State."  Arrest Report at 164.  Chicago police observed a group of individuals matching the suspect individuals' description "while in the area of State and Ida B[.] Wells."  Arrest Report at 164.  This group of individuals was observed standing outside the maroon sedan with the doors open.  Arrest Report at 164.  As Chicago police approached, two of the individuals ran from the vehicle while the other three, including Defendant, were taken into custody without incident.  Arrest Report at 164.

Again, probable cause is not a high bar.  *Wesby*, 138 S. Ct. at 586.  Individuals matching the description of three people reported to be in possession of an incendiary device were observed in the same area of the report, standing in close proximity to a maroon sedan with the doors open.  When law enforcement approached, two of the five individuals fled.  Under the totality of the circumstances, there was probable cause to believe the vehicle contained contraband or other evidence of a crime, namely, incendiary devices.  Accordingly, pursuant to the automobile exception, no warrant was required to search the vehicle.

24

Based on the foregoing, the Court recommends that Defendant's motion to suppress evidence from his arrest and the search of his vehicle in Chicago be denied.

## C.  Motion to Suppress Statements

Defendant moves to suppress the statements he made on May 31, 2020, following his arrest on grounds they were obtained after he invoked his right to counsel.

"The Fifth Amendment requires that *Miranda* warnings be given when a person is interrogated by law enforcement after being taken into custody." *United States v. Giboney*, 863 F.3d 1022, 1027 (8th Cir. 2017); *see also Miranda v. Arizona*, 384 U.S. 436, 444-45, (1966).  "Officers must provide *Miranda* warnings to suspects in custody because 'the inherently coercive nature of custodial interrogation blurs the line between voluntary and involuntary statements.'" *United States v. Diaz*, 736 F.3d 1143, 1148 (8th Cir. 2013) (internal quotation marks omitted) (quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011)).  "Failure to do so results in a violation of the suspect's Fifth Amendment rights and renders any statement gained from the violation inadmissible in the government's case-in-chief." *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012).  A suspect may waive his or her *Miranda* rights, "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444; *accord Maryland v. Shatzer*, 559 U.S. 98, 104 (2010); *see also, e.g.*, *United States v. Evans*, No. 19-cr-294(2) (PJS/LIB), 2020 WL 1930586, at *3 (D. Minn. Mar. 4, 2020), *report and recommendation adopted*, 2020 WL 1923225 (D. Minn. Apr. 21, 2020).

### 1.  Invocation of Counsel

"If the suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him." *Davis v. United States*, 512 U.S. 452, 458 (1994); *see, e.g.*, *Evans*, 2020 WL 1930586, at *3; *United States v. Kouayara*, 189 F. Supp. 3d 835, 845 (D. Minn. 2016).  But, if the suspect "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Miranda*, 384 U.S. at 444-45.  "If he requests counsel, 'the interrogation must cease until an attorney is present.'" *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (quoting *Miranda*, 384 U.S. at 474); *accord Shatzer*, 559 U.S. at 104.  As such, a suspect, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by authorities until counsel has been made available to him, unless the [suspect] himself initiates further communication, exchanges or conversations with the police." *Edwards*, 451 U.S. at 484-85; *accord Davis*, 512 U.S. at 458.

"'The implicit assumption' behind the *Edwards* rule is that an officer's request for interrogation, if made after a suspect invokes his or her rights, 'pose[s] a significantly greater risk of coercion' than the same request if made prior to invocation." *Kouayara*, 186 F. Supp. 3d at 845 (quoting *Shatzer*, 559 U.S. at 105) (alteration in original).  "That increased risk results not only from the police's persistence in trying to get the suspect to talk, but also from the continued pressure that begins when the individual is taken into custody as a suspect and sought to be interrogated—pressure likely to increase as custody is prolonged." *Shatzer*, 559 U.S. at 105 (quotation omitted); *accord Kouayara*, 189 F.

Supp. 3d at 845.  "The *Edwards* presumption of involuntariness ensures that police will not take advantage of the mounting coercive pressures of prolonged police custody by repeatedly attempting to question a suspect who previously requested counsel until the suspect is badgered into submission."  *Shatzer*, 559 U.S. at 105 (quotation and citation omitted).

To invoke his or her right to counsel and end questioning by law enforcement, "the suspect must unambiguously request counsel."  *Davis*, 512 U.S. at 459; *accord Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *see also, e.g.*, *Evans*, 2020 WL 1930586, at *3. The suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  *Davis*, 512 U.S. at 459; *see United States v. Adams*, 820 F.3d 317, 323 (8th Cir. 2016) (invocation of right to remain silent must be "a clear, consistent expression of a desire to remain silent") (quotation omitted).  "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, . . . [police are] not require[d to] . . . ceas[e] . . . questioning."  *Davis*, 512 U.S. at 459; *accord Berghuis*, 560 U.S. at 381.  "This is an objective inquiry which considers the circumstances surrounding the request."  *Evans*, 2020 WL 1930586, at *6 (citing *Davis*, 512 U.S. at 458-59).

Focusing on the initial statements he made as the FBI agents entered the room, Defendant argues that he explicitly and unequivocally invoked his right to counsel and therefore, under *Edwards*, the agents were required to cease any interrogation.  But

27

Defendant takes too narrow a view of his purported invocation, which must be viewed in light of the surrounding circumstances. The purported invocation came just as the agents were entering the room. The agents quickly sought to clarify whether Defendant was in fact invoking his right to counsel. Roughly 20 seconds after Defendant first stated that he wanted a lawyer and did not want to speak with the agents, he reversed course, waving the agents in and telling the agents he would speak with them. Under the totality of the circumstances, a reasonable officer would have viewed these circumstances as ambiguous and only that Defendant "*might* be invoking the right to counsel." *Davis*, 512 U.S. at 459; *see Evans*, 2020 WL 1930586, at *7. Defendant's purported invocation was not an unambiguous request for counsel, and the agents were not required to stop speaking with him. *See Evans*, 2020 WL 1930586, at *7; *see also Adams*, 820 F.3d at 323.

### 2. Valid Waiver

As the Supreme Court observed in *Davis*, "when a suspect makes an ambiguous or equivocal statement[,] it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." 512 U.S. at 461. "Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statements regarding counsel." *Id.*

The agents here did exactly that. They explained that, before they would speak with Defendant, they would read him his rights and make sure he understood them. Notwithstanding Defendant's response that he knew his rights, the agents still went through

28

his rights with him, asking whether he understood them and if he had any questions. While the process of obtaining Defendant's signature on the consent form was interrupted by the first agent's departure to take a phone call and Defendant's responses were not always audible, Defendant's actions indicated his willingness to sign the consent form and speak with the agents when he reached out to sign the form while he and the second agent were waiting for the first agent to return. Moreover, upon the first agent's return and before the agents began to question Defendant, the first agent again confirmed that Defendant was willing to speak with them; Defendant had read and understood his rights; and it was Defendant's signature on the form.

Defendant maintains that the Government has failed to prove that he voluntarily waived his *Miranda* rights.

> The waiver inquiry "has two distinct dimensions": waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*Berghuis*, 560 U.S. at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *accord United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011). Courts consider the totality of the circumstances in determining whether a waiver is valid, and the Government bears the burden of proving validity by a preponderance of the evidence. *Vinton*, 631 F.3d at 483; *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004).

29

"As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protections those rights afford." *Berghuis*, 560 U.S. at 385; *accord United States v. House*, 939 F.2d 659, 662 (8th Cir. 1991) ("[W]aiver may be inferred from the fact that the defendant responded to questions posed by the interviewer after being advised of his rights."); *United States v. Soto*, No. 07-cr-0223 (PJS/JSM), 2007 WL 3120816, at *13 (D. Minn. Oct. 23, 2007) ("[A] defendant's willingness to answer questions after acknowledging his *Miranda* rights is sufficient to constitute an implied waiver."); *United States v. Mandujano*, No. 03-cr-178(2) (JRT/FLN), 2003 WL 22076577, at *4 (D. Minn. Aug. 22, 2003) ("Waiver can be inferred by conduct, and a willingness to answer questions after acknowledging *Miranda* rights is sufficient to constitute an implied waiver.").

### a.   Voluntary

"A confession is voluntary if it is 'the product of an essentially free and unconstrained choice by its maker.'" *United States v. New*, 491 F.3d 369, 374 (8th Cir. 2007) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)); *accord Vinton*, 631 F.3d at 482. "In order to determine whether a confession was voluntary, [courts] look to the totality of the circumstances and must determine whether the individual's will was overborne." *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (quotation omitted). "A statement is not considered involuntary unless the police extorted it from the accused by means of coercive activity." *Vinton*, 631 F.3d at 482 (quotation omitted); *accord New*, 491 F.3d at 374 ("Our cases hold that a confession may not be found involuntary absent

some type of coercive activity on the part of law enforcement officials.") (quotation omitted).

Defendant maintains "[t]here was nothing voluntary about the interrogation after th[e] initial interaction" because "[t]he conversation needed to end as soon as [the] agents entered the cell and [he] requested a lawyer." Def.'s Reply at 6. As stated above, however, Defendant did not unambiguously invoke his right to counsel. Defendant does not assert that the FBI agents engaged in coercive activity. Nor could he. This Court's independent review of the video of the May 31 interview with Defendant "clearly and readily indicates that the [agents] did not engage in threatening or coercive tactics." *Evans*, 2020 WL 1930586, at *5. The agents were professional and respectful during the interview and made no threats or promises. *See id.*

### b.  Knowing & Intelligent

It is not enough that the Government "establishes that a *Miranda* warning was given and the accused made an uncoerced statement . . . . The [Government] must make the additional showing that the accused understood these rights." *Berghuis*, 560 U.S. at 384. "To make a knowing and intelligent waiver, the defendant must have 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *United States v. Gallardo*, 495 F.3d 982, 990 (8th Cir. 2007) (quoting *Moran*, 475 U.S. at 421).

Defendant has not asserted that the waiver was not knowingly and intelligently made. Again, the Court's independent review of the interview video "shows that Defendant fully comprehended the nature and scope of the conversation not only at its

31

inception but also during the entirety of the . . . interview." *Evans*, 2020 WL 1930586, at
\*6. The agents repeatedly asked Defendant if he understood his *Miranda* rights or had any
questions before they interviewed him. Defendant in fact demonstrated an understanding
of his *Miranda* rights even before the agents went over them with him. Defendant also
responded appropriately to questions being asked of him.

Based on the foregoing, the Court concludes that Defendant made a voluntary,
knowing and intelligent waiver of his *Miranda* rights and therefore recommends that
Defendant's motion to suppress his statements be denied.

### D. Motion to Dismiss Indictment: Failure to State Offense

Defendant moves to dismiss Counts 1 and 3 of the Indictment, charging him with
civil disorder and arson respectively, for failure to state an offense.[7]

An indictment must contain "a plain, concise, and definite written statement of the
essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "An indictment
is adequate if it contains all of the essential elements of the offense charged, fairly informs
the defendant of the charges against which he must defend, and alleges sufficient
information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent
prosecution." *United States v. Palmer*, 917 F.3d 1035, 1039 (8th Cir. 2019) (quotation
omitted); *see also, e.g.*, *United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008). "An
indictment is normally sufficient if its language tracks the statutory language." *Sewell*, 513
F.3d at 821; *see, e.g.*, *United States v. Flute*, 929 F.3d 584, 587 (8th Cir. 2019) (language

---

[7] At the hearing, Defendant confirmed that this motion related only to Counts 1 and 3. Tr. 20:16-19.

of statute is starting point for determining whether charged crime encompasses the conduct alleged).  The "test of the sufficiency of an indictment is not whether it could have been made more definite and certain." *United States v. Debrow*, 346 U.S. 374, 376 (1953); *see United States v. Tebeau*, 713 F.3d 955, 962 (8th Cir. 2013).  "Indictments are normally sufficient unless no reasonable construction can be said to charge the offense." *United States v. Nabors*, 45 F.3d 238, 240 (8th Cir. 1995) (quotation omitted); *see also, e.g.*, *Palmer*, 917 F.3d at 1039; *United States v. Mann*, 701 F.3d 274, 288 (8th Cir. 2017); *Sewell*, 513 F.3d at 821.

### 1.  Count 1: Civil Disorder

Count 1 charges Defendant with committing civil disorder in violation of 18 U.S.C. § 231(a)(3).  A "civil disorder" is "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual."  18 U.S.C. § 232(1).  In relevant part, § 231(a)(3) makes it a crime to

> commit[] . . . any act to obstruct, impede, or interfere with any . . . law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

Defendant argues that the Indictment "fails to set forth any factual allegations to indicate how [he] interfered with any law enforcement officers performing official duties, or how he obstructed commerce, the movement of any article and commodity in

commerce[,] and the performance of any federally protected function."  ECF No. 33 at 2; *see* Def.'s Mem. in Supp. at 1 n.1 (resting on arguments in motion).

The Indictment alleges that large numbers of law enforcement officers and members of the National Guard were deployed to quell civil disorders—"includ[ing] acts of violence, arson, looting, and other malicious damage to property"—that arose in the wake of the peaceful protests surrounding the death of George Floyd.  Indictment ¶ 2.  The Indictment further alleges that "[t]hese civil disorders caused damage to numerous businesses engaged in interstate commerce," thereby "obstruct[ing], delay[ing], and adversely affect[ing] interstate commerce," and "obstructed, delayed, and adversely affect[ed] a federally protected function."  Indictment ¶ 2.

As to Defendant's conduct, the Indictment alleges that Defendant acted to obstruct, impede, or interfere with law enforcement officers responding to the civil disorders by "passing out explosive devices he indicate[d] he possessed" and "encouraging others to throw his explosive devices at law enforcement officers responding to the public protests." Indictment ¶ 4; *see* Indictment ¶ 5.  The Indictment sets forth examples, referenced by time stamp, in which video allegedly shows Defendant identifying "SWAT trucks"; stating he has "some bombs" if people "want to throw them back"; encouraging others to "bomb them back"; explaining how to use the "bombs" ("light it and throw it") "as he handed out an item with brown casing and a green wick to other individuals"; remarking that another individual is "going to bomb the police" with one of his "bombs"; and praising the "bomb's" delivery ("good shot my boy").  Indictment ¶ 5.

The Indictment sets forth sufficient facts that: (1) civil disorders existed at the time of Defendant's alleged conduct; (2) those civil disorders were in some way or degree obstructing, delaying, or adversely affecting commerce or the movement of items in commerce; (3) law enforcement officers were lawfully engaged in efforts to respond to those civil disorders; and (4) by handing out explosive devices and encouraging others to throw those devices at such law enforcement officers, Defendant knowingly acted to obstruct, impede, or interfere with the efforts of such officers. *See United States v. Casper*, 541 F.2d 1275, 1276 (8th Cir. 1976) (per curiam) (listing elements); *see also United States v. Mechanic*, 454 F.2d 849, 854 (8th Cir. 1971) (intent as essential element).

The Indictment also charges Defendant in connection with a civil disorder resulting in interference with a federally protected function.  Indictment ¶ 7.  *See Casper*, 541 F.2d at 1276 ("That such civil disorder was resulting in interference with a federally protected function.").  A "federally protected function" is "any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection and distribution of the United States mails." 18 U.S.C. § 232(3).

The Government did not identify the manner in which the civil disorders that law enforcement officers were responding to in the wake of the protests following George Floyd's death allegedly interfered with a federally protected function.  In fact, the Government did not address Defendant's federally-protected-function argument at all.  In responding to Defendant's motion, the Government focused solely on law enforcement

officers and the alleged acts committed by Defendant that obstructed, impeded, or interfered with their ability to respond to the civil disorders. *See* Gov't's Consol. Resp. at 17-18.

Regardless, based on the Court's conclusion that the Indictment plainly sets forth sufficient facts as to a violation of § 231(a)(3) with respect to civil disorders interfering with commerce or the movement of items in commerce, the federally-protected-function argument is moot. The federally-protected-function aspect of § 231(a)(3) is joined with the disjunctive "or." "When, as here, a statute is worded in the disjunctive, federal pleading requires that an indictment charge in the conjunctive to inform the accused fully of the charges." *United States v. Urkevich*, 408 F.3d 1031, 1036 (8th Cir. 2005) (quotation omitted); *see also, e.g.*, *United States v. Schmidt*, 571 F.3d 743, 747 (8th Cir. 2009) ("Rules of federal pleading require indictments to charge in the conjunctive, using the term 'and,' even when the statute is drafted in the disjunctive, using the term 'or.'") (citing *United States v. Vickerage*, 921 F.2d 143, 147 (8th Cir.1990)).

Therefore, the Court recommends that Defendant's motion be denied with respect to Count 1.

### 2.  Count 3: Arson

Count 3 charges Defendant with arson in violation of 18 U.S.C. §§ 2 and 844(i) for "maliciously damag[ing] by means of fire" a Sprint store located in Minneapolis, which is "a building used in interstate commerce." Indictment ¶ 11. In relevant part, § 844(i) states that

> [w]hoever maliciously damages . . . by means of fire or an
> explosive, any building, vehicle, or other real or personal
> property used in interstate or foreign commerce or in any
> activity affecting interstate or foreign commerce shall be
> imprisoned for not less than 5 years and not more than 20 years,
> fined under this title, or both . . . .

There is no dispute that the Indictment tracks the langue of § 844(i).  *See, e.g.*, *Flute*, 929 F.3d at 587; *Sewell*, 513 F.3d at 821.  Acknowledging that the Indictment alleges that he "discusse[d] lighting a fire at the [Sprint] store," Defendant argues that the Indictment "fails to allege that he actually caused any damage."  ECF No. 33 at 2; *see* Def.'s Mem. in Supp. at 1 n.1.

 "[A] court may not insist that a particular word or phrase appear in the indictment when the element is alleged 'in a form' which substantially states the element."  *United States v. Villarreal*, 707 F.3d 942, 957 (8th Cir. 2013) (quotation omitted); *accord United States v. Wyatt*, 853 F.3d 454, 457 (8th Cir. 2017); *see also, e.g.*, *United States v. Mayer*, No. 19-cr-0096 (WMW/HB), 2020 WL 2520672, at *4 (D. Minn. May 18, 2020).  Similarly, "[a]n indictment need not use the specific words of the statute, so long as by fair implication it alleges an offense recognized by law."  *Villarreal*, 707 F.3d at 957 (quotation omitted).  And, as stated above, an indictment is normally sufficient unless no reasonable construction can be said to charge the offense.  *See, e.g.*, *Palmer*, 917 F.3d at 1039; *Mann*, 701 F.3d at 288; *Sewell*, 513 F.3d at 821; *Nabors*, 45 F.3d at 240.

The Indictment alleges that Defendant is on video asking for lighter fluid; entering a Sprint store in Minneapolis; and, a few second later, stating that he "lit [the store] on fire."  Indictment ¶ 5.  The Indictment sufficiently alleges a violation of § 844(i) as it

CASE 0:20-cr-00104-NEB-TNL   Doc. 70   Filed 01/06/21   Page 38 of 49

specifically asserts that Defendant lit a store on fire, and it is a more than fair implication that lighting a store on fire causes damage to it.

Therefore, the Court likewise recommends that Defendant's motion be denied with respect to Count 3.

### E. Motion to Dismiss Indictment: Constitutional Challenges

Lastly, Defendant moves to dismiss the Indictment on grounds that each of the three counts he is charged with is "based on statutes that are overly broad and vague."  ECF No. 34 at 1.  At the hearing, the Court ordered additional briefing on this motion to clarify the constitutional challenges being asserted.  Tr. 22:13-23:17.  The Court directed that such briefing (1) specifically identify the type of constitutional challenge being asserted; (2) state where applicable whether such challenge is facial, as-applied, or both; and (3) set forth the relevant factual and legal bases in support of the challenge.  Tr. 23:8-17. Defendant has done little to clarify his constitutional arguments in the manner directed by the Court.  This lack of clarity has rendered his arguments difficult to parse.

#### 1. As-Applied Challenges

Defendant has asserted as-applied challenges to the civil-disorder, 18 U.S.C. § 231(a)(3), and arson, 18 U.S.C. § 844(i),[8] statutes as well as the Anti-Riot Act ("ARA"), 18 U.S.C. § 2101 *et seq.  See* Def.'s Mem. in Supp. at 13; *see generally* ECF No. 34.  The parties agree that such challenges require resolution of factual issues related to the alleged offenses and are therefore premature at this time.  Gov't's Consol. Resp. at 22; Def.'s Mem.

---

[8] Although the arson charge encompasses both 18 U.S.C. § 2 and § 844(i), Defendant has not asserted any challenges to § 2.

38

in Supp. at 13; Gov't's Suppl. Opp'n at 11.  *See United States v. Turner*, 842 F.3d 602, 604-06 (8th Cir. 2016); *see, e.g.*, *United States v. Gantt*, No. 20-CR-2020-CJW, 2020 WL 6821020, at *12 (N.D. Iowa Sept. 2, 2020), *report and recommendation adopted*, 2020 WL 5653983 (N.D. Iowa Sept. 23, 2020); *United States v. Waldo*, No. 19-03117-01-CR-S-RK, 2020 WL 2617134, at *2 (W.D. Mo. Jan. 22, 2020), *report and recommendation adopted*, 2020 WL 2616736 (W.D. Mo. May 22, 2020); *United States v. Stupka*, 418 F. Supp. 3d 402, 406  (N.D. Iowa 2019).  Therefore, the Court recommends that Defendant's motion to dismiss be denied without prejudice as to all as-applied challenges to the civil-disorder and arson statutes and the ARA.

## 2.  Facial Challenges

Defendant has also asserted facial challenges to the civil-disorder and arson[9] statutes and the ARA.  "Imprecise laws can be attacked on their face as either overbroad or vague." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1157 (8th Cir. 2014); *accord Musser v. Mapes*, 718 F.3d 996, 1000 (8th Cir. 2013).

### a.  Vagueness

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  "Stemming from this guarantee is the concept that vague statutes are void." *United States v. Cook*, 782 F.3d 983, 987 (8th Cir. 2015) (quotation omitted), *cert. denied*, 577 U.S. 906 (2015); *see also United States v. Williams*, 553 U.S. 285, 304 (2008).  "[T]he void-for-vagueness doctrine

---

[9] *See supra* n.8.

39

requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *see also, e.g.*, *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018); *Williams*, 553 U.S. at 304.  It "guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes." *Dimaya*, 138 S. Ct. at 1212; *see also, e.g.*, *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) ("Vague laws contravene the first essential of due process of law that statutes must give people of common intelligence fair notice of what the law demands of them.") (quotation omitted).  It also "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Dimaya*, 138 S. Ct. at 1212.  "'Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.'" *United States v. Washam*, 312 F.3d 926, 929 (8th Cir. 2002) (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32-33 (1963)).

In order to challenge facially a statute as void for vagueness, a defendant must "show that the statute is vague as applied to his particular conduct." *United States v. Bramer*, 832 F.3d 908, 909 (8th Cir. 2016) (per curiam) (citing *Cook*, 782 F.3d at 987); *see Johnson v. United States*, 576 U.S. 591, 602 (2015) ("[O]ur *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."); *see also Turner*, 842 F.3d at 606 n.1; *cf.*

*Stupka*, 418 F. Supp. 3d at 408 ("The case law on th[e] issue [of when a facial void-for-vagueness challenge is allowed] is limited and unclear.").

While Defendant has presented a myriad of hypotheticals as to the purported vagueness of the civil-disorder and arson statutes and the ARA, he has not articulated how these statutes are vague as applied to *his* particular conduct.  Under existing precedent, Defendant's facial challenges to these statutes as being void for vagueness cannot succeed. *Bramer*, 832 F.3d  at 909-10; *see Hood v. United States*, 342 F.3d 861, 864 (8th Cir. 2003); *see, e.g.*, *Waldo*, 2020 WL 2617134, at *2-3; *Stupka*, 418 F. Supp. 3d at 412-13.  However, in light of the Court's recommendation regarding Defendant's as-applied challenges, *see supra* Section III.E.1, the Court will likewise recommend that Defendant's motion to dismiss be denied without prejudice as to facial challenges of the civil-disorder and arson statutes and the ARA as void for vagueness.

### b.   Overbreadth

"[O]utside the limited First Amendment context, a criminal statute may not be attacked as overbroad."  *Schall v. Martin*, 467 U.S. 253, 268 n.18 (1984); *see Musser*, 718 F.3d at 1001 ("The facial overbreadth doctrine is restricted in its application . . . and is not recognized outside the limited context of the First Amendment.") (quotation omitted). "Criminal statutes may be overbroad on their face, when they purport to punish speech or expressive conduct that is otherwise protected by the First Amendment."  *United States v. Shabazz*, No. CR. 4-95-3 (JMR/FLN), 1995 WL 235026, at *5 (D. Minn. Apr. 11, 1995), *report and recommendation adopted in part*, 883 F. Supp. 422 (D. Minn. 1995).  Under this doctrine, "[a] statute is facially invalid if it prohibits a substantial amount of protected

41

speech." *Williams*, 553 U.S. at 292; *accord United States v. Stevens*, 559 U.S. 460, 473 (2010).   "Invalidation for overbreadth is strong medicine that is not to be casually employed." *Williams*, 553 U.S. at 293 (quotation omitted).   As such, "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003); *see, e.g.*, *United States v. Warsame*, 537 F. Supp. 2d 1005, 1016 (D. Minn. 2008) ("overbreadth challenge will rarely succeed against a statute that does not specifically regulate speech").

### i.   Counts 1 & 3: Civil Disorder & Arson

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine if the statute reaches too far without first knowing what the statute covers." *Williams*, 553 U.S. at 293; *accord Stevens*, 559 U.S. at 474.

Neither the civil-disorder nor the arson statute purports to regulate First Amendment expression.   Beginning with the civil-disorder statute, the Eighth Circuit Court of Appeals held in *Mechanic* that "§ 231(a)(3) has no application to speech, but applies only to violent *physical* acts."   454 F.2d at 852 (emphasis added).   Because § 231(a)(3) "reaches only acts to impede, obstruct, or interfere with police officers and firemen," it "does not purport to reach speech of any kind."   *Id.* at 853.

Relying on the Supreme Court's decision in *City of Houston v. Hill*, Defendant likens § 231(a)(3) to a municipal ordinance which, in relevant part, made "it unlawful for any person to in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty."   482 U.S. 451, 461 (1987) (quotation omitted).   The Supreme Court

held that the municipal ordinance "prohibit[ed] verbal interruptions of police officers," and therefore was overbroad because it "criminalize[d] a substantial amount of constitutionally protected speech, and accord[ed] the police unconstitutional discretion in enforcement." *Id.* at 461, 466. Defendant's argument that "[t]here is no requirement under [§ 231(a)(3)] that the criminal act be physical rather than verbal," ECF No. 34 at 4, overlooks the Eighth Circuit's holding in *Mechanic* that "§ 231(a)(3) . . . applies only to violent *physical* acts." 454 F.2d at 852 (emphasis added). This Court will apply Eighth Circuit precedent. *Hood*, 342 F.3d at 864.

Similarly, the arson statute is not directed at First Amendment expression. Rather, § 844(i) prohibits the damage or destruction by fire (or explosive) of buildings, vehicles, or other real or personal property used in interstate commerce. Section 844(i) is therefore distinguishable from those regulations expressly directed at the flag.[10] *See generally, e.g.*, *United States v. Eichman*, 496 U.S. 310 (1990); *Texas v. Johnson*, 491 U.S. 397 (1989); *cf. Gallagher v. City of Clayton*, 699 F.3d 1013, 1021 (8th Cir. 2012) ("Examples of inherently expressive conduct that warrant constitutional scrutiny when burdened by legislation include the burning of the American flag . . . ."). Further, Defendant's undeveloped argument that "[t]he burning of one's own property could be one's prerogative," ECF No. 34 at 10, ignores *Russell v. United States*, 471 U.S. 858 (1985), in which the Supreme Court upheld a conviction under § 844(i) for a person who set fire to an apartment building he owned and operated as a rental property. *See also, e.g.*, *United States v. Salas*, 889 F.3d

---

[10] And, assuming for sake of argument that the personal property burned was a flag, such an argument would more appropriately be raised in the context of an as-applied challenge concerning the defendant's own conduct rather than a facial overbreadth challenge.

681, 684 (10th Cir. 2018) ("[Section] 844(i) may apply to a person who destroys his or her own property."); *Evey v. United States*, No. 2:16-CV-08900-SVW, 2018 WL 6133407, at *6 (C.D. Cal. May 10, 2018) ("Section 844(i) does not have, as an element, that the involved property must belong to 'another'. . . .  An arson conviction can be premised on the burning of one's own property in contemplation of purely economic harm to others.") (citation omitted).

Accordingly, the Court recommends that Defendant's motion to dismiss the civil-disorder and arson charges on grounds that the underlying statutes are overbroad be denied.

### ii.   Count 2: Riot

The Government acknowledges that, in *United States v. Miselis*, 972 F.3d 518 (4th Cir. 2020), the Fourth Circuit Court of Appeals recently determined that portions of the ARA are overbroad and therefore unconstitutional under the First Amendment.[11]  Gov't's Suppl. Opp'n at 12.   In *Miselis*, the Fourth Circuit held that the ARA "sweeps up a substantial amount of speech that remains protected advocacy under" *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam), "in so far as it encompasses speech tending to 'encourage' or 'promote' a riot under 18 U.S.C. § 2101(a)(2), as well as speech 'urging' others to riot or 'involving' mere advocacy of violence under 18 U.S.C. § 2102(b)."  972 F.3d at 525-26; *see id.* at 535-39.  Finding that the rest of the ARA "comport[ed] with the First Amendment" and that "the[se] discrete instances of overbreadth [we]re severable from the remainder of the [Act]," the Fourth Circuit severed these provisions, leaving the

---

[11] The Ninth Circuit Court of Appeals also recently heard argument on the constitutionality of the ARA.  *United States v. Rundo*, No. CR 18-00759-CJC, 2019 U.S. Dist. LEXIS 233081 (C. D. Cal. June 3, 2019), *appeal filed*, No. 19-50189 (9th Cir. June 12, 2019) (oral argument heard Nov. 17, 2020).

remainder of the ARA intact.  *Id.* at 526; *see id.* at 541-44.; *cf., e.g.*, *United States v. Dellinger*, 472 F.2d 340, 360-62 (7th Cir. 1972); *Nat'l Mobilization Comm. to End War in Viet Nam v. Foran*, 411 F.2d 934, 936-39 (7th Cir. 1969); *United States v. Betts*, No. 20-20047, 2020 WL 7700093, at *4-5 (C.D. Ill. Dec. 28, 2020); *United States v. Hoffman*, 334 F. Supp. 504, 509 (D. D.C. 1971).  *But see Rundo*, 2019 U.S. Dist. LEXIS 233081, at *7-18.

Defendant argues that "[p]ersons seeking to exercise the[] fundamental rights [of freedom of assembly and free speech] can easily find themselves subject to federal felony riot charges because other participants in an assembly engage in violent acts, or even just make constitutionally protected political statements that are interpreted under this overly broad statute to be threats of violence."  ECF No. 34 at 8.  This argument ignores that, in order for there to be a conviction, the Government must prove the defendant "acted with specific intent to engage in unprotected speech or conduct" under § 2101(a).  *Miselis*, 972 F.3d at 535; *see* 18 U.S.C. § 2101(a) ("Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, *with intent . . .*.") (emphasis added).  Indeed, the same argument was rejected by the Seventh Circuit Court of Appeals in *Foran*, where it was argued that the "mere presence in a crowd, some of whom might be performing acts of violence, could be considered participating in a riot."  411 F.2d at 938.  The Seventh Circuit reasoned:

> Plaintiffs' arguments based on guilt by association, loss of control over a theretofore peaceful assembly, and strict liability for the acts of anyone joining an intended peaceful

> demonstration simply fail to take account of the language of the statute. The statute does interdict riot-connected overt acts, but only if the prescribed intent is present when the interstate travel or use of interstate facilities occurs. Thus the intent to engage in one of the prohibited overt acts is a personal prerequisite to punishment under this provision and necessarily renders any challenge based on innocent intent or unexpected result wide of the mark.

*Id.*; *see also Betts*, 2020 WL 7700093, at *5.

Defendant also argues that the Fourth Circuit did not go far enough in *Miselis* and should have severed "organize" from § 2101(a)(2) as well because "'organizing . . . also is inherently speech and falls within the First Amendment freedoms of assembly and to petition [the] government." Def.'s Mem. in Supp. at 15.

Defendant himself acknowledges that the Fourth Circuit "engaged in extensive analysis as to how the language of [the ARA] criminalized conduct protected by the First Amendment" in *Miselis*. Def.'s Mem. in Supp. at 15. As part of this extensive analysis, the Fourth Circuit expressly considered the use of "organize" in § 2101(a)(2) and found that it was not overbroad. *Miselis*, 972 F.3d at 537-38. The Fourth Circuit explained:

> With respect to the verb "organize," however, we reach a different outcome. As it pertains to an event like a riot, "organize" is readily understood to mean "to form or establish something . . . by . . . bringing people together into a structured group," "to oversee the coordination of the various aspects of something" or "to arrange the components of something in a way that creates a particular structure." *See Organize*, Encarta Webster's Dictionary of the English Language (2d ed. 2004). We think speech tending to organize a riot might thus include communicating with prospective participants about logistics, arranging travel accommodations, or overseeing efforts to obtain weapons needed to carry out the planned violence.

Yet as these definitions and examples indicate, speech tending to "organize" others to riot consists not of mere abstract advocacy, but rather of concrete aid. For, by the time speech reaches the point of organizing a riot, it has crossed the line dividing abstract idea from material reality, even if its components must still be brought together, coordinated, arranged, or otherwise structured into form.

In other words, speech tending to organize a riot serves not to persuade others to engage in a hypothetical riot, but rather to facilitate the occurrence of a riot that has already begun to take shape. Such speech comes much closer to "preparing a group for violent action" than merely "teaching . . . the moral propriety" of violence in the abstract, *Brandenburg*, 395 U.S. at 48, 89 S. Ct. 1827, and may even be characterized as the sort of "aiding and abetting of criminal conduct" that doesn't qualify for First Amendment protection, *see Rice*, 128 F.3d at 242-43. It follows that speech tending to organize a riot under § 2101(a)(2), unlike that of encouraging and promoting a riot, doesn't implicate mere advocacy of lawlessness, and may thus be proscribed without reference to *Brandenburg*.

*Id.* at 537-38. Defendant's conclusory, one-sentence argument does not diminish the

persuasive force of the Fourth Circuit's reasoned analysis.

Procedurally, Defendant has challenged the overbreadth of the ARA in a motion to

dismiss a count in the Indictment. The Government's memorandum reflects an acceptance

of *Miselis* as it applies to this case:

However, the *Miselis* opinion left large portions of the statute intact, including the provisions [Defendant] is charged with violating. To be clear, [Defendant] is not charged with merely promoting or encouraging rioting. The Indictment focuses on [Defendant's] organization, participation, and actions in carrying on a riot in and around Minneapolis. [Defendant] provides no basis for expanding the scope of *Miselis* and does nothing to refute its constitutional analysis, which upholds the portions of the statute [Defendant] faces.

Gov't's Suppl. Opp'n at 12 (citation omitted).  In light of the Government's apparent acquiescence to *Miselis* for purposes of this case, the Court recommends that Defendant's motion to dismiss be granted in part to the extent that Count 2 of the Indictment charges Defendant with encouraging or promoting a riot under § 2101(a)(2).[12]  *See Miselis*, 972 F.3d at 542-43.

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrants, ECF No. 30, be **DENIED**.

2. Defendant's Motion to Suppress Evidence from Search and Seizure of Defendant and Vehicle in Chicago, ECF No. 31, be **DENIED**.

3. Defendant's Motion to Suppress Statement, ECF No. 32, be **DENIED**.

4. Defendant's Motion to Dismiss Indictment for Failure to State Offense, ECF No. 33, be **DENIED**.

[Continued on next page.]

---

[12] Given the present procedural posture and the absence of any express allegations in the Indictment that Defendant "urged" others to riot or that his alleged conduct "involved" mere advocacy of violence, *see generally* Indictment, the effects, if any, of *Miselis*'s holding with respect to § 2102(b) seem better addressed in the context of any future jury instructions.  *See Betts*, 2020 WL 7700093, at *6.

5. Defendant's Motion to Dismiss Charges Based on Void for Vagueness and Overbreadth, ECF No. 34, be **DENIED WITHOUT PREJUDICE IN PART** as to all as-applied challenges and facial vagueness challenges to the civil-disorder and arson statutes as well as the ARA; **DENIED IN PART** as to facial challenges to the civil-disorder and arson statues as overbroad; and **GRANTED IN PART** to the extent that Count 2 of the Indictment charges Defendant with encouraging or promoting a riot under § 2101(a)(2) of the ARA.

Date: January    6    , 2021

_s/ Tony N. Leung_

Tony N. Leung
United States Magistrate Judge
District of Minnesota

_United States v. Rupert_
Case No. 20-cr-104 (NEB/TNL)

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.