UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal Case No. CR 20-104 (NEB/TNL)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **DEFENDANT'S OBJECTIONS TO** |
| | ) | **REPORT AND RECOMMENDATION** |
| MATTHEW LEE RUPERT, | ) | |
| | ) | |
| Defendant. | ) | |

Defendant Matthew Lee Rupert, hereby objects to the Report and

Recommendation of the Magistrate Judge filed on January 6, 2021 (Doc. 70), including

specifically the Recommendation to deny Defendant's motion to suppress evidence from

the arrest of Mr. Rupert and search of his vehicle in Chicago, Illinois on an FBI search

warrant on or about May 31, 2020 (discussed at pages 18-25); the Recommendation to

deny Defendant's motion to suppress his statement made during a custodial interrogation

on May 31, 2020 (discussed at pages 25-32); the Recommendation to deny of Defendant's

motion to dismiss the indictment for failure to state and offense (discussed at pages 32-

38); and the Recommendation to deny Defendant's motion to dismiss the Indictment on

the grounds that the charged statutes are facially overbroad and vague in violation of due

process.  This Objection is filed pursuant to Fed.R.Civ.P. 72(b) and Local Rule 72.2.

Mr. Rupert submits legal argument below as to his motion to suppress evidence

from his arrest and the search of his vehicle, and from his interrogation. With respect to

the other objections, Mr. Rupert relies on his previously submitted motions and memoranda which are hereby incorporated by reference.

## I.   SUPPRESSION OF EVIDENCE FROM ARREST IN CHICAGO AND SEIZURE OF VEHICLE.

### *Factual Background*

The government's only witness at the suppression hearing was was FBI special agent F.M. Stephens. Stephens was not in Chicago and did not observe Mr. Rupert's arrest or the search of his vehicle. (Hearing Tr. 77, 85). He had no knowledge of any of Mr. Rupert's activities in Chicago prior to his arrest. (Tr. 78).  Stephens had no communications with the Chicago police officers who arrested Mr. Rupert. (Hearing Tr. 77). He provided a Chicago police report that he obtained through agents in Chicago. (Hearing Tr. 56-58). Stephens could not identify which specific agent provided him with the police report, or how that agent obtained the report. (Tr. 58-59).  The police report claimed that Mr. Rupert was arrested for a curfew violation, on the grounds that the mayor of Chicago had issued a curfew order from 9 pm - 6 am. (Tr. 62, 78-79, 97-98; Hearing Exhibit E). There was no evidence presented that there was any basis prior to Mr. Rupert's arrest that he had engaged in looting, damage to property or any criminal activity in Chicago. (Tr. 78-79. 98).

Agent Stephens was unable to cite any state or local law that Mr. Rupert violated in connection with the curfew. (Tr. 79-82).  Stephens has not seen the legal authority that makes a curfew violation a crime. (Tr. 82). He did not see any specific order regarding a

curfew that was referenced in the police report or the statute or law that authorized such

an order. (Tr. 83-84). The police report does not contain a citation to any specific law that

Mr. Rupert allegedly violated. (Hearing Ex. E).  Agent Stephens agreed that a law

enforcement agent is required to know what law is violated in order to make an arrest.

(Tr. 81).  The government did not produce the purported curfew order as evidence and

has not cited any legal authority for such an order or that would make violation of such an

order a criminal offense.

According to the police report, Mr. Rupert owned the vehicle that police seized

and searched in Chicago in connection with his arrest. (Tr. 60-61, 84; Hearing Exhibit E).

Police conducted a "custodial search" of the vehicle after arresting Mr. Rupert and seized

and inventoried multiple items of evidence. (Hearing Ex. E).

***Legal Analysis.***

 The Magistrate Judge erred by automatically crediting the general summary of

events set forth in the Chicago police officer's report without testimony from any witness

with personal knowledge of any of the events, by determining that the existence of a

curfew order issued earlier that day by the mayor automatically provided valid probable

cause for an arrest regardless of the legal or constitutional validity of that order, and by

determining there was probable cause to search Mr. Rupert's vehicle based on vague and

uncorroborated allegations in the police report.  The R&R recognized but failed in

practice to apply the standard that the burden of proof is on the government to show

existence of probable cause to support a warrantless search or seizure. See United States v. Andrews, 454 F.3d 919, 922 (8th Cir. 2006) (referring to the possibility that in the suppression hearing below the Government might have "failed in its burden to prove that Deputy Brown had probable cause to stop Mr. Andrews's car"); Carter v. United States, 729 F.2d 935, 940 (8th Cir. 1984) ("As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, but on the government to justify a warrantless search."); Recznik v. City of Lorain, 393 U.S. 166, 169–70 (1968) (holding that a "motion to suppress should have been granted" because the prosecutor "did not meet the burden of showing probable cause").

The R&R found the arrest was valid based solely on the existence of a curfew order, irrespective of whether the curfew order itself was legally valid or was even applicable to Mr. Rupert - contentions that were extensively brief on behalf of Mr. Rupert. "The Court expresses no opinion on the ultimate validity of the Curfew Order and whether Defendant may have available to him certain legal defenses in the event he is charged with violating that Order." (Doc. 70 at 21). The R&R concluded that under the probable cause standard, "a reasonably prudent Chicago police officer having knowledge of the Curfew Order would believe that someone out during curfew has committed or is committing a crime." (Id. at 22).

The R&R fundamentally misconstrues the probable cause standard. It is true, as the magistrate noted, that the standard is not as high as what is needed for a criminal

conviction, "whether the facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed." Beck v. State of Ohio, 379 U.S. 89, 96, 85 S. Ct. 223, 228, 13 L. Ed. 2d 142 (1964)(citing Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)). However, there was no authority cited and no apparently authority that exists which approves of an arrest where the conduct observed by the officer did not actually constitute an offense, or where the underlying offense was legally invalid or unconstitutional.

The subjective belief of police officers that a law was violated in fact runs contrary to the established standard for probable cause which is an objective standard. "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard." Terry v. Ohio, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 1880, 20 L. Ed. 2d 889 (1968). "[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer." Devenpeck v. Alford, 543 U.S. 146, 153, 125 S. Ct. 588,

5

594, 160 L. Ed. 2d 537 (2004) (quoting Horton v. California, 496 U.S. 128, 138, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)). Even if the government had produced meaningful evidence that the officers had a genuine belief that there was a government order authorizing Mr. Rupert's arrest, it would have still failed to meet its burden of demonstrating probable cause to justify the arrest in the absence of specific grounds to conclude that Mr. Rupert violated the curfew order, or where the curfew order was legally invalid.

Although no citation for the curfew order was provided in the police report and the FBI agent who testified at the hearing was not familiar with the curfew order, the government obtained from the internet the hearing had concluded and Mr. Rupert submitted his post-hearing memorandum, a purported order issues by the Mayor of Chicago and Commissioner of Health of the City of Chicago on May 30, 2020. (Doc. 60-1). Mr. Rupert appears to have been arrested shortly after midnight on May 31, 2020. It is unknown how he could have had any notice that being on the streets of Chicago was deemed illegal.

An examination of the curfew order and underlying authority makes it clear that it does not validly set forth a criminal offense. The Order first cites as its authority Section 2-4-110 of the Chicago Municipal Code. This ordinance empowers the Chicago mayor to coordinate activities in response to certain emergencies, and dates that "Obedience to his orders in executing such plans and meeting such emergencies is obligatory on all

departments and head of departments and upon all other officers and employees of the

City of Chicago." Chicago Code. § 2-4-110. This ordinance specifically does not bind

anyone to the mayors orders who does not directly work for the City of Chicago. Nothing

in the ordinance states that violations of any order by the mayor is a criminal offense or

can result in arrest.

The curfew order then cites city ordinances authorizing the Commissioner of

Health of the City of Chicago to implement emergency measures, including Code

Sections 2-112-070 and 2-112-080. (Doc. 60-1). These questionable ordinances authorize

certain health officials to arrest persons who violate health provisions of the City Code,

Chicago Code. § 2-112-070, or to exercise police power to correct health hazards.

Chicago Code. § 2-112-080. Neither of these ordinances apply to the situation where Mr.

Rupert was arrested. Mr. Rupert was not accused of violating any provisions of the health

code. There were not health code provisions cited in the police report, or by the

government at any other time in this proceeding.  § 2-112-080 is vague as to what sort of

police powers are authorized to address health hazards but Mr. Rupert was not in any

event accused of creating any health hazards. According to the police report, he was

present at a large scale political protest. The curfew order is improperly attempting to

restrict political protest under the guise of a health emergency.

The Report and Recommendation confused the language applicable to probable

cause of  a"reasonably prudent" officer being able to conclude a crime was committed,

with somehow relieving an officer from responsibility to even make a reasoned determination that the law actually applied under the circumstances. An examination of the purported curfew order, for which there is not even evidence that the police officer was relying on that order, shows that it does not even apply to Mr. Rupert or authorize his arrest under the circumstances. The R&R did not even address any of these above arguments which were all advanced by Mr. Rupert. (See Doc. 68 at 3-5).

While it is not clear that the curfew order provided by the government was the order relied upon by the arresting officers or that the order applied ot Mr. Rupert, there is ample legal authority compelling a conclusion that it was invalid.  A crime is based on a law. An order issued by an government executive officer is not a law. A law, including especially a criminal law, must be passed by a legislative body.

A pertinent line of authority is federal case law sets forth the limits of presidential executive orders. "Another strand of our separation-of-powers jurisprudence, the delegation doctrine, has developed to prevent Congress from forsaking its duties." Loving v. United States, 517 U.S. 748, 758, 116 S. Ct. 1737, 1743, 135 L. Ed. 2d 36 (1996).  "It does not suffice to say that Congress announced its will to delegate certain authority. Congress as a general rule must also 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" Id. (citing J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928); Touby v. United States, 500 U.S. 160, 165, 111 S.Ct. 1752, 1755–1756 (1991)).

"The intelligible-principle rule seeks to enforce the understanding that Congress may not delegate the power to make laws and so may delegate no more than the authority to make policies and rules that implement its statutes." Id. (citing Marshall Field & Co. v. Clark, 143 U.S. 649, 693–694, 12 S.Ct. 495, 504–505 (1892)). "The legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes or intends to make its own action depend. United States v. Grimaud, 220 U.S. 506, 520, 31 S. Ct. 480, 484, 55 L. Ed. 563 (1911)(quoting Marshall Field & Co. v. Clark, 143 U. S. 694, 36 L. ed. 310, 12 Sup. Ct. Rep. 495 (1892)). In order for a legislative body to delegate authority to prescribe criminal punishments, at least as to Congress, it must "makes the violation of regulations a criminal offense and fixes the punishment, and the regulations 'confin[e] themselves within the field covered by the statute.' " Id. (quoting United States v. Grimaud, 220 U.S. 506, 518, 31 S.Ct. 480, 483, 55 L.Ed. 563 (1911) and citing Touby v. United States, 500 U.S. 160, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991)).

If there was a curfew order that authorized Mr. Rupert's arrest, in order for it to be constitutionally valid in accordance with separation of powers requirements, a legislative body would at least have needed to delegate authority to the mayor to issue such a curfew order, make violation of the order a criminal offense, and the order would have has to confine itself within the parameters authorized by the legislation.

In addition to the possible that the curfew order violated constitutional separation of powers requirements, such a blanket restriction preventing anyone from being outside at night likely violated First Amendment protections for free speech See e.g. Forsyth Cnty. v. Nationalist Movement, 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992)(Any regulation on the use of a public forum must: (1) be "justified without reference to the content of the regulated speech;" (2) be "narrowly tailored to serve a significant governmental interest;" (3) "leave open ample alternative channels for communication of the information;" and (4) "not delegate overly broad licensing discretion to a government official."). There is also a fundamental right of freedom of movement. Papachristou v. City of Jacksonville, 405 U.S. 156, 163, 92 S. Ct. 839, 844, 31 L. Ed. 2d 110 (1972) "In all the states, from the beginning down to the adoption of the Articles of Confederation, the citizens thereof possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective states, to move at will from place to place therein, and to have free ingress thereto and egress therefrom, with a consequent authority in the states to forbid and punish violations of this fundamental right." United States v. Wheeler, 254 U.S. 281, 293, 41 S. Ct. 133, 134, 65 L. Ed. 270 (1920).

The Magistrate Judge's decision not to address the validity of the curfew violation constituted an avoidance of the Court's responsibility. As stated, probable cause is an objective standard even if it is based on fact known to police at the time of the arrest. If

the underlying authority for the arrest was constitutionally invalid, the decision to arrest based on that law or order was objectively invalid. Evidence from the arrest must be suppressed.

The R&R also erred in finding their was probable cause to search Mr. Rupert's vehicle. It concluded that based on an unspecified, unverified and uncorroborated report that three people very vaguely have a similar description to some of the persons in Mr. Rupert's group, that there was probable cause to believe the vehicle contained incendiary devices. (Doc. 70 at 24). This does not come close to the applicable standard that requires a specific and objective factual basis for a reasonably prudent officer to conclude it is more likely than not that the vehicle contained evidence of a crime. There are no specific facts provided describe the suspected incendiary devices or that they were such devices that violated any laws. There are no specific facts provide regarding the how Mr. Rupert or his companions matched "descriptions" provided of the suspected individuals. The R&R's cursory acceptance or a cursory police report is does not come close to meeting the level of rigor required to uphold constitutional rights.

**B.**   **Suppression of Statement.**

   *1.  Relevant Facts*

As soon as FBI agents entered Mr. Rupert's holding cell and introduced themselves, he requested to speak with an attorney. (Tr. 73; Hearing Exhibit G). An agent repeated Mr. Rupert's statement, which agent Stephens who was not present at the

interview claimed was a "clarifying question." (Tr. 73). The agents who conducted the interview did not testify. Agent Stephens was not even able to identify the agents who conducted the interview. (Tr. 85).

The government introduced into evidence a consent from that Mr. Rupert allegedly signed to waive his Miranda rights. (Hearing Exhibit H). The video suggests agents handed Mr. Rupert a form after he had requested an attorney. (Hearing Exhibit G). The government's only witness, agent Stephens, did not personally observe Mr. Rupert read the form or sign it. (Tr. 85-86).

### 2. *Legal Analysis.*

Mr. Rupert's statement to FBI agents must be suppressed as a violation of his Fifth and Sixth Amendment rights because it was the product of interrogation after he had clearly invoked his right to an attorney. The R&R does not dispute that Mr. Rupert invoked his right to counsel but indicates that because "the purported invocation came just as the agents were entering the room" the agents should be able to "clarify whether the Defendant was in fact invoking his right to counsel." There was nothing that could be construed as ambiguous in Mr. Rupert stating explicitly that he wanted an attorney as soon as agents walked into his cell. The fact that Mr. Rupert demanded an attorney immediately before any discussion with the agents makes his demand even more unequivocal rather than ambiguous. His explicit and unqualified demand for a lawyer was

in clear contrast to the case cited in the R&R, <u>Davis v. United States</u>, 512 U.S. 452 (1994) where the accused said, "Maybe I should talk to a lawyer."

      The Supreme Court makes clear that an accused's request for an attorney requires agents to cut off any interrogation. "Miranda itself indicated that the assertion of the right to counsel was a significant event and that once exercised by the accused, 'the interrogation must cease until an attorney is present.'" <u>Edwards v. Arizona</u>, 451 U.S. 477, 485, 101 S. Ct. 1880, 1885, 68 L. Ed. 2d 378 (1981)(<u>citing</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 474, 86 S.Ct. 1602, 1627 (1966)). "We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." <u>Edwards v. Arizona</u>, 451 U.S. 477, 484–85, 101 S. Ct. 1880, 1885, 68 L. Ed. 2d 378 (1981).  The R&R conveniently and erroneous sweeps aside this strong precedent which makes clear that agents' efforts to coax Mr. Rupert to reverse his invocation of his right to counsel violated <u>Miranda</u> and its progeny.

Dated:  January 29, 2021           LAW OFFICE OF JORDAN S. KUSHNER

                             By  s/Jordan S. Kushner
                                Jordan S. Kushner, ID 219307
                                Attorney for Defendant
                                431 South 7th Street, Suite 2446
                                Minneapolis, Minnesota  55415
                                (612) 288-0545