UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-104 (NEB/TNL)

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | **GOVERNMENT'S POSITION ON SENTENCING** |
| MATTHEW LEE RUPERT, | |
| Defendant. | |

Defendant Matthew Lee Rupert had no intention of peacefully protesting the death of George Floyd. Rupert instead packed a large duffel bag of artillery-shell fireworks and traveled over 6 hours from Illinois to Minnesota. He recruited a juvenile and two others to join him. Upon arrival, Rupert immediately started a Facebook Live broadcast and proudly proclaimed "we came to riot!" Rupert proceeded to broadcast his crimes to the world—rioting, looting, damaging property, and ultimately committing arson. This conduct unfortunately is commensurate with Rupert's lengthy criminal history. The United States respectfully recommends that the Court sentence Rupert to 115-months' imprisonment followed by a three-year term of supervised release. The United States respectfully submits that this sentence aligns with the purposes of criminal punishment: deterrence, incapacitation, and just punishment.

## I.     FACTUAL BACKGROUND

### A.     The May 25, 2020 Death of George Floyd and related protests and civil unrest.

On May 25, 2020, George Floyd died while in the custody of the Minneapolis Police Department.  The nature and circumstances of Mr. Floyd's arrest, subsequent death, and the actions of the Minneapolis Police Department came under intense public scrutiny.  Almost immediately following Mr. Floyd's death, public protests began in Minnesota, expanded throughout the Twin Cities, and spread around the world.  These protests were overwhelmingly peaceful despite the size and scope of the movement.  It is an unfortunate reality that a small minority opted to hijack this moment to engage in their own forms of chaos and destruction.  Rupert is one such individual.

### B.     Rupert's plan to travel to Minneapolis to riot.

On May 28, 2020, Rupert decided he was coming to Minneapolis and wanted "goons" to join him:



Rupert successfully recruited his brother, a friend, and a minor. His recruitment of the minor—a longtime family friend—was both knowing and explicit. Rupert repeatedly called the minor via Facebook and, after making contact, asked if the minor would join him tomorrow. The minor asked why, and Rupert responded his group was "going to the riot!" Following additional encouragement, the two had the following exchange:

> **Author** M█████ H█ Facebook: ██████████)
> **Sent** 2020-05-29 04:52:05 UTC
> **Body** Even if my mom said no im 17 so the cops wont do shit about ne leaving
>
> **Author** El Ricco Rupert (Facebook: 100048401743589)
> **Sent** 2020-05-29 05:21:49 UTC
> **Body** Yeah u got to go bro
>
> **Author** M█████ H█ (Facebook: ██████████)
> **Sent** 2020-05-29 05:22:21 UTC
> **Body** I am for sure. What time should I set my alarm for?
>
> **Author** El Ricco Rupert (Facebook: 100048401743589)
> **Sent** 2020-05-29 05:56:15 UTC
> **Body** I'll be up around 9

As Rupert admitted at his Change of Plea hearing, the juvenile grew up in a home nearby Rupert's home, and Rupert had known the juvenile since the juvenile was a small child. (Dkt. No. 98 at 43:15-21).

Aside from recruitment, Rupert also packed a large duffel bag filled with four-inch, artillery-style, fireworks:



The relevance of Rupert's pre-planning cannot be overstated—he carefully deployed both the minor and the artillery-style fireworks during the commission of his subsequent criminal activity.

### C. Rupert riots, loots, destroys, and commits arson.

Rupert arrived in Minneapolis with his "goons," announced his intention to riot via Facebook Live, and—at one point—panned the Minneapolis skyline while discussing his desire to burn it to the ground. The entirety of Rupert's rioting, looting, destruction, and arson described herein was simultaneously broadcast via Facebook Live by Rupert on his El Rico Rupert Facebook account for over two hours.[1]

Rupert's efforts began by immediately seeking out confrontation with law enforcement while armed with his duffel bag full of 4-inch, artillery-shell fireworks. Immediately after locating law enforcement outside of a recently boarded up and looted Target on Lake Street, Rupert started offering his "bombs" to bystanders and

---

[1] The government will submit the entire livestream, as well as isolated clips from it, as exhibits prior to the sentencing hearing.

4

encouraging them to "light that bitch and throw it at them." Rupert's Facebook Live video captured his repeated directions of "light it and throw it; light it and throw it." There is no doubt as to Rupert's intended target, as he explained "[t]here are SWAT trucks up there. They got SWAT trucks up there . . . I've got some bombs if some of you all want to throw them back . . . bomb them back." Rupert was elated when he successfully incited the bystanders to join him in throwing his "bombs" at law enforcement. He loudly announced that the group was "throwing my bombs" and he praised those he recruited when the devices loudly exploded near law enforcement with comments like "good shot my boy." Rupert punctuated his actions with repeated overtures of "Fuck 12."[2]

Rupert then transitioned his efforts to generalized vandalism as he meandered down Lake Street with his three recruits who traveled with him from Illinois. The group threw rocks at various buildings and Rupert destroyed the glass enclosure of a bus stop. Rupert broke into or trespassed into various buildings—often providing the tools needed to loosen the plywood installed by local business owners and intended to keep looters out. For example, approximately 41 minutes into his livestream, Rupert stated "let's go fuck up the liquor store" and provided a tool to loosen the store's plywood barrier. Soon after, he volunteered to enter the liquor store and then sadly confirmed it was empty.

---

[2] The term "Fuck 12" is a derogatory phrase often directed at law enforcement officers.

After approximately 1 hour and 41 minutes into his broadcase, and over a 2 mile walk down Lake Street, Rupert and his group arrived at a boarded-up Sprint Store located at 3009 Nicollet Avenue. As he admitted during his change of plea hearing, Rupert asked for lighter fluid prior to entering the boarded-up store. (Dkt. No. 86). Rupert, followed by his brother and the juvenile, entered the store by crawling through a break in the plywood. (*Id.*). Rupert canvassed the store and eventually entered a backroom while telling others that he had located a store safe. (*Id.*). Rupert and others, including his brother and the juvenile, knocked several boxes into a pile on the ground in the backroom. (*Id.*). Rupert sprayed the pile with lighter fluid and then directed the juvenile to light the pile on fire. (*Id.*). At Rupert's direction, the juvenile did so. As soon as the boxes were lit on fire, Rupert and the juvenile fled the building. Rupert's brother had already fled the building. Approximately 4 minutes later, at time stamp 1 hour 45 minutes, Rupert livestreamed himself outside the Sprint store yelling "I lit it on fire." (*Id.*).

The building, which is used in interstate commerce, sustained significant damage because of the fire. The fire, which was lit near the store's inventory safe, triggered the store's fire suppression system. Rupert admitted this is precisely what he intended. (PSR ¶ 26.) As a result, all fixtures, electronic/IT items, and retail inventory remaining in the store after the May 28, 2020 looting were damaged, destroyed, or not salvageable.

After setting this fire, Rupert and his group entered a boarded-up Office Depot. Surveillance video captured Rupert stealing items such as printer cartridges and a

laptop bag. Rupert and his group clearly took more as the group left the store pushing a shopping cart full of looted items. They eventually found their car and returned to Galesburg, Illinois. Rupert continued his livestream as they returned home, including when a local patrol officer pulled Rupert's car over for a traffic violation, and Rupert narrated that he was convinced the group will be arrested.

### D.    Rupert's subsequent arrest in Chicago.

Upon returning to Illinois, and fresh off his "success" in Minneapolis, Rupert again turned to Facebook to solicit "goons" for more rioting. Initially, he sought "goons" to go to Davenport, Iowa, with him to "riot this mf!!!!" Rupert indicated he was ready to go to "WAR."



But, as Rupert announced in a May 30, 2020 Facebook post, he eventually decided Chicago was a better option. In response to Rupert's friend expressing concern for his well-being—"over there they just don't pull out guns, they use them"—Rupert responded "I got [sic] a glizzy."[3]



On May 30, 2020, to minimize the violence and destructive rioting, the mayor of Chicago imposed a citywide curfew from 9 p.m. until 6 a.m. on May 31, 2020. (Dkt. 39). On May 31, 2020, shortly before 1:30 a.m., law enforcement officers received a report that four individuals were violating Chicago's curfew order and may be in possession of incendiary devices. (Dkt. 39). Law enforcement officers found four individuals matching the reported description standing next to a maroon 4-door

---

[3]  Glizzy is slang term used to refer to a Glock firearm. *See* https://www.urbandictionary.com/define.php?term=Glizzy (last accessed July 22, 2021). The term can also refer to a hot dog. *See id.* The context appears obvious.

8

sedan. *Id.* Following a brief foot pursuit, law enforcement officers apprehended Rupert. *Id.* He subsequently admitted that he owned the maroon 4-door sedan, which law enforcement officers confirmed by running the vehicle's registration. *Id.* A custodial inventory search of the vehicle revealed, among other things, a backpack filled with incendiary devices. *Id.*

### E. The Federal Indictment and Subsequent Guilty Plea

On June 10, 2020, the Grand Jury returned an indictment charging Rupert with riot, civil disorder, and arson. (Dkt. 12). On April 8, 2021, after this Court adopted the R&R denying Rupert's suppression motions, Rupert opted to plead guilty to the arson charge in exchange for the United States dismissing the other charges. (Dkt. 86). Rupert admitted he used a juvenile to commit the crime, but is contesting the base offense level for the arson.

## II. SENTENCING ANALYSIS

### A. The U.S. Sentencing Guideline Calculations

The government agrees with the facts and conclusions of the PSR, which result in a Guidelines range of 92 to 115 months. (PSR at ¶ 108.) This stems from a total offense level of 23 and a criminal history category of VI. (*Id.*) Because Rupert objects to the calculation of his base offense level, the government highlights an issue that will arise during the evidentiary hearing preceding sentencing.

#### 1. Rupert's Arson Destroyed a Place of Public Use

The PSR calculated a base offense level of 24 because Rupert's arson involved the destruction or attempted destruction of a place of public use. (PSR at ¶ 30; USSG

9

§ 2K1.4(a)(1)(B).) However, the PSR notes Rupert's contention that his base offense level should be 20 because his arson merely endangered a place of public use. (PSR at A.2-A.3.) The government will establish by a preponderance of the evidence that this is not a close question. Rupert's fire totaled the Sprint Store, which remains closed to this day.

The relevant Guidelines sections differentiate arson crimes based on the resulting destruction. USSG § 2K1.4(a)(1)-(2). A base offense level of 24 applies to an arson that destroyed or attempted to destroy a place of public use. USSG § 2K1.4(a)(1)(B). A base offense level of 20 applies to an arson that endangers a place of public use. USSG § 2K1.4(a)(2)(C). A place open to the public is a place of public use. *United States v. Holmes*, 646 F.3d 659, 660 (9th Cir. 2011). "The Guidelines don't explain what it means to destroy something, but we have a pretty good idea from common usage . . . The question is, when is the change in form sufficient for us to refer to it as destruction?" *Id.* at 661. A thing is considered destroyed when it is "rendered incapable of being used for one of more of its principal purposes, and can't be restored swiftly and relatively cheaply." *Id.* This differs from endangerment, which means "putting the property at risk but resulting in no actual damage, or damage that is less than destruction." *Id.* at 662. The differentiation between destruction and endangerment contains no knowledge or intent requirement. *Compare* USSG 2K1.4(a)(1)(A) (requiring a substantial risk of death or serious bodily injury be "knowingly" created) *with* USSG 2K1.4(a)(1)(B) (omitting any knowledge requirement vis-à-vis destruction).

The destruction caused by Rupert's arson is not a close call. The damaged Sprint store is a place of public use that had been open to the public. Before entering the store, Rupert loudly asked "should we torch it?" He subsequently entered its backroom, created a pile of cardboard boxes to act as kindling, doused the pile in lighter fluid, and torched it. The resulting fire led everyone to race for the exits and triggered the fire suppression system, which ran for nearly 24 hours. Sprint terminated its lease on the property due to the damage and the store *remains* closed to this day. For these reasons, Rupert's fire clearly rendered the store "incapable of being used for one of its principal purposes" and resulted in damage that could not be restored "swiftly and relatively cheaply." *See Holmes*, 646 F.3d at 661-62; *see also United States v. Henderson*, 20-cr-146 (applying base offense level 24 to quickly extinguished fire that triggered fire-suppression system and damaged government center); *United States v. White*, 20-cr-173 (applying base offense level 24 to arson that damaged Enterprise Rent-A-Car building).

Because Rupert's arson destroyed the Sprint store, the Court should overrule his objection to the PSR and determine that the base offense level is 24.

### B. The Section 3553(a) Factors Demonstrate that a Sentence of 115-Months' Imprisonment is Appropriate

Rupert's pre-planning, interstate travel, clear disinterest in peaceful protest, livestreaming of his riotous behavior, and carefully orchestrated destruction warrants a sentence at the top of the advisory Guidelines range. This position is bolstered by Rupert's criminal history and penchant for posting YouTube videos of himself publicly menacing law enforcement. The United States respectfully submits

11

a sentence of 115-months' imprisonment followed by a three-year term of supervised release is necessary to achieve the goals of 18 U.S.C. § 3553(a).

> 1. ***The nature and circumstances of Rupert's offenses in the District of Minnesota warrant a sentence of 115 months' imprisonment.***

Rupert's actions make plain that he had no lawful purpose for being in Minnesota on May 29, 2020. He instead drove over 400 miles to exploit an aggrieved community for fun. In preparation for this trip, Rupert packed a duffle bag full of artillery-shell fireworks, but apparently forgot his signs protesting the death of George Floyd. Rupert recruited his brother, a friend, and a juvenile to come to Minneapolis with him. Upon arrival, Rupert encouraged bystanders, who were previously unknown to him, to throw his "bombs" (i.e., he artillery-shell fireworks that he brought from home) at law enforcement. He proceeded to repeatedly turn away from peaceful protesting to instead target local business for looting and destruction. This happened time and time again for the duration of Rupert's destructive path through Minneapolis. Throughout his time here, Rupert co-opted, manipulated, and commanded a juvenile to assist him. Unsatisfied, Rupert then sought to reprise his behavior in Chicago.

And this criminality still was not enough of a thrill for Rupert. Instead, he took several intentional steps to record and document his time in Minneapolis. Rupert used his Facebook account to broadcast for the world to watch as he crowed about his desire to riot and burn Minneapolis to the ground. He continued

broadcasting as he made good on that promise by running from the Sprint store while announcing he had been victorious in committing arson.

Rupert's actions, standing alone, are severe, dangerous, and warrant accountability. But his decision to broadcast them for over two hours for others to enjoy, emulate, and celebrate is an aggravating factor that warrants additional punishment.

### 2. *Rupert's personal history and characteristics warrant a sentence of 115 months' imprisonment.*

Rupert is a Criminal History Category VI despite not yet reaching 30 years of age. Since the age of 17, Rupert has at least 18 noteworthy criminal events in which he violated the law or threatened public safety. (PSR ¶¶ 41-61.)

The nature and circumstances of Rupert's criminal history is serious and violent—ranging from felony theft, residential burglary, battery, domestic violence, resisting arrest, disorderly conduct, providing stolen firearms to others, and being a felon in possession of a firearm himself. (*Id.*) Rupert also faces a pending matter for possession of methamphetamine. (PSR ¶ 78.) This history is aggravated by Rupert's habit of failing to appear for court, violating the terms of his release, and returning to his criminal behavior. Notably, Rupert committed the instant offense while serving a criminal justice sentence. (PSR ¶ 62.) Law enforcement also seized firearms, ammunition, a suspected marijuana grow operation, drug trafficking materials, $15,000 in cash, and various quantities of controlled substances from Rupert's residence in the days following his time in Minneapolis. (PSR ¶ 17.)

Rupert apparently attempts to contextualize his criminal history, and his conduct in this matter, by pointing to a deep-seated anger toward law enforcement due to previous encounters with "super aggressive" officers. (PSR ¶ 23.) But, once again, Rupert's habit of broadcasting his own behavior undercuts his assertion. Matthew Rupert appears in numerous videos on YouTube entitled "Matthew Rupert Pine Street." The videos, some of which remain on YouTube, are replete with Rupert directly taunting and insulting law enforcement with vulgar language—examples include: "Go suck a dick, bitch;" "You're a straight fairy, bro;" "Make sure you blow your buddy off good;" "Hey fat boy;" and "Bitch ass faggots." Each of these encounters include law enforcement officers calmly doing their job and resisting Rupert's apparent desire to escalate the situation.[4]

Not even Rupert's incarceration during the pendency of this matter has deterred him from criminal behavior. Since his incarceration, Rupert has possessed alcohol, threatened other inmates, engaged in a physical altercation, and threatened to harm correctional officers. (PSR ¶ 2.) Rupert's unwillingness to listen to correctional officers required the use of a chemical agent to end one altercation. (*Id.*)

### 3. *The need to protect the public from Rupert's future crimes warrants a sentence of 115 months' imprisonment.*

Rupert is a danger to recidivate. His criminal history, which rivals individuals twice his age, documents a pattern of failures to appear, disrespect for the law, and steadily escalating pattern criminal conduct. There is nothing in the record before

---

[4] A representative sampling of these videos will be included in the government's exhibits for sentencing.

14

the Court to support that Rupert traveled to Minneapolis to peacefully protest or mourn the death of George Floyd. Rupert instead clearly stated his purpose by announcing to the world on social media that he came to Minneapolis to riot. He took steps to prepare himself for that purpose by recruiting others to join him and packing his duffle bag full of fireworks. The risk to the public created by Rupert's actions in Minneapolis is endless. Rupert recruited bystanders to riot, provided lit fireworks to be thrown with bare hands, cheered when those fireworks exploded near law enforcement officers, destroyed public property, looted, and torched a Minneapolis business. Rupert's actions throughout his trip to Minneapolis were consistently aimed at the public, put the public at risk of danger, and enflamed an already-fraught situation. A lengthy sentence will ensure that Rupert is incapacitated to ensure public safety while Rupert will have time to work to rehabilitate himself, if he so chooses, for eventual release.

### 4. *The need for deterrence warrants a sentence of 115 months' imprisonment.*

In this case, there is a need for both individualized and general deterrence. As to individualized deterrence, despite Rupert's extensive previous experiences with the criminal justice system, he was not deterred from engaging in a lengthy series of offenses in Minneapolis. Only a significant sentence is likely to influence Rupert's future behavior. Accordingly, a sentence of 115-months' imprisonment is an appropriate attempt to deter Rupert from committing this or similar crimes again in the future.

A significant sentence is also important as a general deterrent. While nobody hopes for widespread civil disorders in the future, the likelihood of such events remains a distinct possibility as the Country grapples with this period of societal change. By sentencing Rupert to a term of imprisonment at the top of the Guidelines range, a general deterrent message is sent to members of the public who may idolize Rupert's approach or seek to emulate his actions. The requested sentence also is incrementally harsher than other arsons in this district in the wake of the death of George Floyd in an effort to reflect the aggravating circumstances of Rupert's conduct. *See, e.g.*, *United States v. Henderson*, 20-cr-146 (imposing 78-month sentence and 3-year term of supervised release on local defendant with less severe criminal history for isolated incident of aiding and abetting arson); *United States v. White*, 20-cr-173 (imposing 72-month sentence and 3-year term of supervised release on local defendant for isolated arson.)

### C. A Three-Year Term of Supervised Release is Appropriate Under the Circumstances Present Here

A lengthy term of supervised release is also important to protecting the public from Rupert, and to ensure his prospective compliance with the law. Given the nature of Rupert's offenses and his previous criminal history, the maximum 3-year term of supervised release is warranted. After serving his prison sentence, Rupert must be closely monitored to ensure his behavior remains law-abiding and that he complies with the terms of his supervised release. Importantly, the restitution amount requested in this matter is significant. Considering his age, Rupert has a significant chance of paying down the requested restitution in this matter. A lengthy

term of supervised release will ensure that a Probation Officer is supervising the defendant's financial activities.

### D. Restitution

Rupert's fire, which triggered the fire-suppression system, caused extensive damage to the physical structure of the Sprint store, the strip mall that housed it, destroyed inventory, and lost rental income. Liberty Mutual insured the property and—although the claim remains open—has to-date paid nearly $4,000,000 to repair the building and replace lost rental income. Sprint lost hundreds of thousands of dollars in inventory and terminated its lease of the property nearly 2-years early because of the extensive damage. The property remains closed.

Given Rupert's financial circumstances and for other individualized reasons, neither Liberty Mutual, the property manager, nor Office Depot are seeking restitution in this matter. Each party made this decision after detailed conversations with the government and despite their entitlement to such an order. This largely speaks to the exasperation these parties feel toward Rupert. T-Mobile, which is Sprint's corporate owner, is seeking restitution and has dutifully worked to present a request that is narrowly tailored to Rupert's conduct.

The United States understands that Sprint intends to seek restitution for several categories of losses it sustained by Rupert's fire and the subsequent triggering of the fire-suppression system. The categories of losses include: lost inventory and associated activations for the retail products stored in the store safe; value of the damaged cash and inventory safe; and the value of the LAN Rack and Associated IT

items located in the store's backroom. Sprint's losses will be submitted to the Court in the form of an affidavit from one of T-Mobile's Senior Channel Planning & Programs Manager, who was employed by Sprint on the night of the fire and involved in the security preparations and post-fire response.

### III. CONCLUSION

For the reasons set forth above, the United States respectfully asks the Court to sentence Matthew Lee Rupert to a term of imprisonment of 115 months, followed by a three-year term of supervised release. The requested sentence is commensurate with the Rupert's criminal conduct and is wholly consistent with the tenets of Section 3553(a). Most importantly, under all the facts and circumstances of this case, it also is a fair and just sentence.

Dated: July 22, 2021                                  Respectfully submitted,

                                                      W. ANDERS FOLK
                                                      Acting United States Attorney

                                                      */s/ Angela M. Munoz*

                                                      */s/ Jordan L. Sing*

                                                      BY: ANGELA M. MUNOZ (389207)
                                                      JORDAN L. SING (393084)
                                                      Assistant U.S. Attorneys